# 23-7133(L); 24-835

In The

# United States Court Of Appeals
## For The Second Circuit

**UNITED STATES OF AMERICA,**

*Appellee/USA,*

v.

**PASQUALE AMATO, CARMINE SESSA, LAWRENCE A. FIORENZA, LAWRENCE MAZZA, JOSEPH RUSSO, AKA JO JO, ANTHONY RUSSO, AKA CHUCKIE, ROBERT ZAMBARDI, AKA BOBBY ZAM, JOSEPH MONTELEONE SR., AKA JOE MONTE SR., ALPHONSE PERSICO, AKA ALLIE BOY, JOSEPH TOMASELLO, AKA JOE T, THEODORE PERSICO, AKA TEDDY, RICHARD FUSCO, AKA RICHIE, JAMES DELMASTRO, AKA JAMES DELMASTRO,**

*Defendants - Defendants.*

**MICHAEL SESSA, VICTOR J. ORENA, AKA VICTOR J. ORENA, AKA LITTLE VIC,**

*Defendants - Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK (BROOKLYN)
THE HONORABLE ALLYNE R. ROSS, DISTRICT JUDGE, NO. 1:92-CR-351-4; ERIC R. KOMITEE, DISTRICT JUDGE 1:92-CR-351-1

_____

## BRIEF OF APPELLANT VICTOR J. ORENA

_____

**David I. Schoen**
**DAVID I. SCHOEN,**
  **ATTORNEY AT LAW**
**2800 Zelda Road**
**Suite 100-6**
**Montgomery, AL 36106**
**(334) 395-6611**

*Counsel for Appellant Victor J. Orena*

# **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..............................1

STATEMENT OF THE CASE....................................................................2

    A.    Nature of the Case and Relevant Procedural History ...........................2

    B.    Statement of the Facts Relevant to the Issues Presented for Review.....................................................................................12

SUMMARY OF THE ARGUMENT ......................................................12

ARGUMENT .......................................................................................13

    I.    The Lower Court Erred in Refusing to Provide De Novo Sentencing for Mr. Orena After a Count of His Conviction was Vacated and In Light of Material Changed Circumstances Since His Original Sentencing in 1993 and With a New Judge Assigned to His Case..................................................................13

        Standard of Review ..........................................................13

    The Lower Court's Misplaced Reliance on *United States v. Pena*, 58 F.4th 613 (2d Cir. 2023) Was Reversible Error ...........................14

    This Court's Decision in *Kaziu v. United States* Requires Vacating the Sentence and Remanding for Full *De Novo* Resentencing...........................19

    The *Kaziu* Decision.........................................................20

    Applying The Decision in *Karziu* to Mr. Orena's Case ................................24

    Changed Circumstances Since Mr. Orena's 1993 Sentencing ......................24

i

II.    On Remand, This Case Should Be Assigned to a Different District Judge for the Full *De Novo* Resentencing...............................38

CONCLUSION ....................................................................................40

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................41

CERTIFICATE OF FILING AND SERVICE ........................................................42

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Concepcion v. United States*,
597 U.S. 481 (2022)...............................................................13, 14

*Kaziu v. United States*,
– F.4th –, 2024 U.S. App. LEXIS 17380,
2024 WL 3418238 (2d Cir., July 16, 2024) .........................................*passim*

*People v. Devecchio*,
2007 N.Y. Misc. LEXIS 7827 (Kings Co. Sup. Ct., Nov. 1, 2007).............33

*People v. Molineux*,
168 N.Y. 264 (1901)............................................................. 34-35

*Pepper v. United States*,
562 U. S. 476 (2011) .............................................................14, 19

*Scarpa v. United States*,
02-cv-3953 (ERK) .......................................................................30

*Tellier v. United States*,
2023 U.S. App. LEXIS 12792,
2023 WL 36008394 (2d Cir. May 24, 2023) ...............................18

*United States v. Beck*,
425 F. Supp. 3d 573 (M.D.N.C. 2019) .........................................25

*United States v. Bernard*,
2023 U.S. Dist. LEXIS 6804 (E.D.N.Y., January 13, 2023).......................17

*United States v. Birkett*,
2023 U.S. Dist. LEXIS 112714 (E.D.N.Y., June 29, 2023) .........................27

*United States v. Booker*,
543 U.S. 220 (2005)....................................................................27

*United States v. Borden,*
    564 F.3d 100 (2d Cir. 2009) ...........................................................................13

*United States v. Brooker,*
    976 F.3d 228 (2d Cir. 2020) ...........................................................................13

*United States v. Davis,*
    588 U.S. 445 (2019)...............................................................................2, 6, 7, 21

*United States v. Hernandez,*
    604 F.3d 48 (2d Cir. 2010) ......................................................................39, 40

*United States v. Holloway,*
    965 F.2d 660 (2d Cir. 2020) ...........................................................................13

*United States v. Monteleone,*
    2023 U.S. Dist LEXIS 62518 (E.D.N.Y., April 10, 2023) ...............28, 29, 30

*United States v. Orena et al.,*
    93 cr 1366 (ERK)............................................................................................32

*United States v. Orena,*
    145 F.3d 551 (2d Cir. 1998)..................................................................... 29-30

*United States v. Orena,*
    32 F.3d 704 (2d Cir. 1994) ..............................................................................4

*United States v. Orena,*
    956 F. Supp. 1071 (E.D.N.Y. 1997)................................................................5

*United States v. Pena,*
    58 F.4th 613 (2d Cir. 2023) ...................................................................*passim*

*United States v. Persico,*
    1997 U.S. Dist. LEXIS 23290,
    1997 WL 867788 (E.D.N.Y., March 13, 1997) ............................................29

*United States v. Powers,*
    842 F.3d 177 (2d Cir. 2016) ..........................................................................14

*United States v. Russo*,
  2022 U.S. Dist. LEXIS 213643,
  2022 WL 17247005 (E.D.N.Y., November 28, 2022) ............................19, 27

*United States v. Theodore Persico, Jr. et al.*,
  CR-92-0351 (CPS) ................................................................................32

*United States v. Woltmann*,
  610 F.3d 37 (2d Cir. 2010) ................................................................13, 39

**Statutes:**

18 U.S.C. § 924 ................................................................................17, 21

18 U.S.C. § 924(c) ........................................................................6, 14, 16

18 U.S.C. § 924(j) ................................................................................17

18 U.S.C. § 2255 ............................................................................*passim*

18 U.S.C. § 2255(b) ................................................................................18

18 U.S.C. § 3553(a) ......................................................................*passim*

18 U.S.C. § 3553(a)(2)(A) ........................................................................25

18 U.S.C. § 3553(a)(2)(B) ........................................................................25

18 U.S.C. § 3553(a)(2)(D) ........................................................................25

18 U.S.C. § 3553(a)(6) ............................................................................27

18 U.S.C. § 3582 ......................................................................6, 7, 8, 25

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 2255(b) ................................................................................17

**Sentencing Guidelines:**

Note 1.(A)(i) of the Commentary to U.S.S.G. § 1B1.13 (2018) ............................25

**Other Authorities:**

BOP Policy Statement 5050.50 Compassionate Release/Reduction in
Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and
4205(g), section 3(b) ..................................................................................................25

http://www.usa-the-republic.com/items%20of%20interest/
Win_At_All_Cost/Switching_sides.htm ..................................................................31

https://nypost.com/2007/01/14/gangland-g-man-sent-rat-into-trap/ .......................31

https://oig.justice.gov/sites/default/files/archive/special/0509/chapter3.htm..........31

https://www.newyorker.com/magazine/1996/12/16/the-g-man-and-the-hit-
man?irclickid=wJ4VAl1VpxyORwmwUx0Mo38QUkBWXDzxQyJWRU0
&irgwc=1&source=affiliate_impactpmx_12f6tote_desktop_Bing%20Rebate
s%20by%20Microsoft&utm_source=impact-
affiliate&utm_medium=2003851&utm_
campaign=impact&utm_content=Logo&utm_brand=tny .......................................31

https://www.nydailynews.com/news/crime/colombo-crime-fam-hit-man-
frankie-blue-eyes-sparaco-lied-killed-fbi-informant-article-1.956248 ...................37

https://www.nydailynews.com/new-york/nyc-crime/brooklyn-judge-fbi-
agent-aided-mob-hits-article-1.2488378 ................................................................33

https://www.nytimes.com/2006/03/30/nyregion/exfbi-agent-accused-of-role-
in-four-organized-crime-killings.html ...................................................................31

https://www.ojp.gov/pdffiles1/nij/256084.pdf ......................................................26

https://www.ussc.gov/sites/default/files/pdf/research-and-
publications/federal-sentencing-statistics/quarterly-sentencing-
updates/USSC-2017_Quarterly_Report_Final.pdf.................................................26

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_FY19.pdf ........................................................26

https://www.youtube.com/watch?app=desktop&v=btQkfCyd6Lw ........................34

Peter Lance, *Deal With the Devil, The FBI's Secret Thirty-Year Relationship with a Mafia Killer* (Morrow 2013) ........................................................................31

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. §1291 over this appeal from the district court's March 20, 2024 Memorandum and Order and Amended Judgment denying *de novo* resentencing and a resentencing hearing, and entering an Amended Judgment and Conviction. *See also Kaziu v. United States*, – F.4th –, 2024 U.S. App. LEXIS 17380, *12, n.3, 2024 WL 3418238 (2d Cir., July 16, 2024).

To the extent the case raises the issue of whether a *de novo* resentencing is required when a count of conviction is overturned through a motion under 18 U.S.C. §2255 and there is a new judge assigned to the case and the defendant raises a plausible claim of changed circumstances, it involves a legal issue subject to *de novo* review on appeal. To the extent it requires the application of that rule to the circumstances of this case, the standard of review on appeal is whether the district court abused its discretion in refusing to hold a resentencing hearing or engage in *de novo* resentencing.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**Whether the Lower Court Erred in Refusing to Conduct a *De Novo* Resentencing or any Resentencing Hearing At All Following the Vacating of a Count of Conviction, Where There Have Been Major Material Changes in Circumstances for the Defendant Since the Original Sentencing and Where a New Judge Has Been Assigned to the Case?**

## STATEMENT OF THE CASE

**A.     Nature of the Case and Relevant Procedural History**

This appeal is from the Amended Judgment of Conviction and Sentence and the Memorandum and Opinion entered March 20, 2024, [A246; A254], by a judge who was new to the case, after a count of conviction was vacated under the authority of *United States v. Davis*, 588 U.S. 445 (2019).  The judge sentenced Mr. Orena to his original 1993 sentence of life imprisonment and a Two Million Dollars ($2,000,000) fine[1], without any re-sentencing hearing or *de novo* re-sentencing consideration of any kind, all over Mr. Orena's adamant objection, and notwithstanding the extraordinary changes in material circumstances since the original Judgment of Conviction and Sentence was entered thirty (30) years earlier. [A243].

The Appellant, Mr. Orena, is an indigent ninety (90) year old man, in progressively debilitating health.  His medical condition indisputably meets the statutory definition of a "terminal" condition as a matter of law.

---

[1]  The court reduced the originally imposed fine from $2.25 million to $2 million after vacating the count, since the original sentencing formula assessed a $250,000 fine per count.  The court ignored Mr. Orena's change in financial circumstances since 1993.  It is now undisputed that after 31 years in prison he is indigent and Probation recognized the same [A326].

2

The judge below in the Eastern District of New York was Judge Eric Komitee. His Memorandum and Opinion and Judgment that are the subject of this appeal are appended hereto at A246; A254. The judge who presided over the trial and imposed the sentence over thirty years ago was Judge Jack B. Weinstein. His Judgment from 1993 is appended hereto at A243.

In April of 1992, the Appellant, Victor J. Orena was arrested to face charges in the Eastern District of New York. [A7]. After a number of superseding indictments in the case, a jury trial was held and Mr. Orena ("Orena") was convicted on December 21, 1992 on the nine counts of the final superseding indictment.[2] On May 26, 1993, following a jury trial, Orena was sentenced by Judge Jack B. Weinstein to terms of life in prison based on his conviction on murder, racketeering, and racketeering conspiracy counts, ten year terms of imprisonment for two murder conspiracy counts, twenty years terms of imprisonment for two loansharking counts, a ten year term of imprisonment for the illegal possession of firearms, all running concurrently, along with a consecutive five year term of imprisonment for the use of a firearm in connection with a crime of violence, a $2,250,000 fine and the daily cost of his imprisonment [A244-45].

---

[2] Documents reflected on the docket sheet from the time period in question are not retrievable through Pacer and the hard copy file apparently has been archived.

On June 3, 1993, Counts from previous superseding indictments were dismissed [A16].

On August 11, 1993, Mr. Orena filed a motion for a new trial [ECF# 507]. On August 31, 1993, an Amended Sentencing Memorandum and Order was entered [ECF# 517]. The motion was denied on October 15, 1993 [ECF# 517].

The government's theory of prosecution was that Mr. Orena was the "acting boss" of the so-called Colombo organized crime family. *Id*.

On August 15, 1994, Orena's judgment of conviction and sentence and an order denying a motion for new trial were affirmed on direct appeal. *United States v. Orena*, 32 F.3d 704 (2d Cir. 1994).

However, almost immediately, information and materials began to surface demonstrating outrageous government misconduct in this case and related cases, including the withholding of information from Mr. Orena that the lead case agent in the government's case against him, Agent Devecchio, for years had a corrupt relationship with a vicious mob killer, Gregory Scarpa, Sr., a leader of the purported faction of the so-called Colombo family that was against Mr. Orena, and that this relationship included the agent providing information to Scarpa to facilitate his murders, while Scarpa served as a government informant.

This information led to further litigation in the case, including a motion to dismiss the indictment, motion for new trial and a motion to set aside the

judgment, under 28 U.S.C. §2255, which raised the evidence of the corruption and government misconduct to the extent it was known at the time [See e.g. ECF## 1124, 1125].

The motions were denied on March 10, 1997 [ECF# 1223]; but the evidence adduced by Mr. Orena of the government misconduct that cast a significant doubt on the integrity of the conviction in this case was of such a character and was so significant, even based on just what was known back then, that, in denying the motion, the trial judge noted the following at the outset: "These are disturbing cases. On the facts and the law, a decision for either side might be justified." *United States v. Orena*, 956 F. Supp. 1071, 1076 (E.D.N.Y. 1997) (Weinstein, J.). Additional governmental misconduct evidence continued to surface and on January 17, 2003 an additional motion to vacate the judgment was filed [No ECF # on Docket].

On January 21, 2004, the motion was denied [ECF# 1728]. Extraordinary additional new evidence later surfaced that clearly demonstrated that this prosecution was characterized by the worst misconduct in the history of the Justice Department, leading to wholesale change in rules regarding the use of confidential informants and exposing abundant exculpatory and impeachment evidence undermining the entire theory of prosecution and the findings Judge Weinstein made about Mr. Orena in connection with his sentencing. Judge Weinstein was

5

never given an opportunity to review this additional extraordinary information. It will be addressed hereinbelow and is directly relevant to sentencing.

In 2020, Mr. Orena moved in the Second Circuit for leave to file a successive petition under 28 U.S.C. §2255, seeking to vacate his conviction on one count of conviction (18 U.S.C. §924(c)), under the authority of *United States v. Davis*, 588 U.S. 445 (2019) and to raise the additional outrageous government misconduct evidence that had surfaced. On September 24, 2020, the Second Circuit transferred the case back to the district court for consideration of the successive §2255 motion, and to vacate the §924(c) conviction [ECF# 1849]. That same date this case was first assigned to Judge Komitee [A35].

On September 25, 2020, the district court entered an order directing the government to show cause regarding the successive §2255 motion.

On October 15, 2020, the government filed its response asserting, *inter alia*, that the §924(c) count of conviction "must be vacated **and the Court should undertake a full resentencing of Orena**." [ECF# 1852 at 1 & 7] (emphasis added). On November 5, 2020, Mr. Orena filed a reply suggesting that in light of Mr. Orena's rapidly declining health and age, he contemplated filing a motion for compassionate relief under 18 U.S.C. §3582 as a matter of first course [ECF# 1853].

On April 29, 2021, the district court held a telephone conference to discuss the schedule for proceeding with respect to the prospective §3582 motion and the agreed upon *de novo* re-sentencing. The court ordered the government to file its position on the ripeness of a §3582 motion before the *de novo* resentencing, and ordered that an updated PSR be prepared by June 11, 2021, with objections and sentencing submissions from the parties to be filed two weeks later [ECF# 1855].

On April 30, 2021, the government filed its response to the court's Order, acknowledging to the court that it had "conceded that the firearm conviction cannot stand in light of the Supreme Court's decision in *United States v. Davis* (citation omitted), **requiring the Court to undertake a full <u>de novo</u> resentencing**." [ECF# 1856] (emphasis added). The government further agreed that a §3582 motion would be ripe or, it advised, the court could proceed with a full re-sentencing at which the court could consider all of the issues that would be raised in a §3582 motion. [*Id.*]

On July 19, 2021, Mr. Orena filed his motion for compassionate release under 18 U.S.C. §3582 [ECF# 1864]. The motion and subsequent pleadings were filed with voluminous medical records attesting to Mr. Orena's "terminal" medical condition and documenting extraordinary new evidence that had come to light since Judge Weinstein's imposition of sentence in 1993 and the motions he had denied in the subsequent years. Many of the medical records were submitted *ex*

*parte* and under seal. Those and the records demonstrating the previously unknown outrageous government misconduct are too voluminous (and expensive) to include in the Appendix hereto; but they are all available to the Court on request. There will further discussion of the same, to the extent relevant here, later in this Brief.

Between that date and November 28, 2022, litigation on Mr. Orena's §3582 motion took place in the district court and on appeal, with the district court denying the motion for compassionate release on October 27. 2021 [ECF# 1876] and this Court affirming the denial and issuing its Mandate on November 28, 2022 [ECF# 1910].[3]

On December 19, 2022, the undersigned wrote to the court to advise that Mr. Orena had suffered a heart attack (on top of his other debilitating ailments) [ECF# 1912]. On April 5, 2023, the district court directed the undersigned to file a status report [Text Order only]. On April 14, 2023, Mr. Orena filed his status report, advising that in light of his rapidly deteriorating health, he would to proceed to "the full *de novo* resentencing to which all parties have advised the Court he is entitled." [ECF# 1922 at 3]. Mr. Orena asked for "a reasonable opportunity to

---

[3] Before this Court in the context of the appeal from the denial of the §3582 motion, the government reiterated its position that Mr. Orena was entitled to a full *de novo* resentencing. [See Second Circuit Docket No. 21-2747, Doc. 49 (3259313) at Page 23 of 53].

consider a fully updated pre-sentence report and file objections to it and then a

reasonable opportunity to prepare for his *de novo* re-sentencing hearing and

specifically to prepare arguments and evidence he must be permitted to adduce and

challenge (citation omitted)." [ECF# 1922 at 4].

On April 21, 2023, by Text Order, the district court scheduled Mr. Orena's

re-sentencing hearing for July 6, 2023. On May 24, 2023, Mr. Orena was provided

with a copy of what purported to be a "Revised PSR." [A263-318]. It was nothing

more than a reprinting of the PSR from 1993, without any relevant updated

information about any of the extraordinary, material changed circumstances that

had occurred between 1993 and 2023.

On June 7, 2023, Mr. Orena filed comprehensive objections to the "Revised"

PSR, raising the general objections that it had not been updated at all since 1993

and specific objections (e.g., referring to Mr. Orena as 58 years old instead of 89;

providing his financial circumstances as they were in 1993, rather than his

undisputed indigence now; omitting all of the now known changed circumstances,

including his terminal medical condition, rehabilitation, community service,

perfect institutional record, minimum safety risk, and concerning the outrageous

government misconduct, exculpatory evidence, and much more) [A46-60].

On June 21, 2023, the court entered a Text Only Order noting the Objections

and directing Mr. Orena, in light of his pressing health issues and the scheduling of

9

the re-sentencing hearing for July 6, 2023, to specify the categories of information in the "Revised" PSR he wanted to have updated, whether he wanted to be interviewed by Probation again, and whether he would consent to adjourn the July 6, 2023 re-sentencing hearing to permit Probation to make the necessary revisions [A39].  On June 23, 2023, Mr. Orena filed his response to the court's Text Order [A61-64].  All objections and submission filed below are incorporated herein.

On June 26, 2023, the government filed a letter with the court, for the first time taking the position that the court need not conduct any re-sentencing proceeding at all, based on the authority of *United States v. Pena*, 58 F.4th 613, 618 (2d Cir. 2023), a case decided six months earlier, indicating that in the exceptional case, where re-sentencing would be "strictly ministerial," no re-sentencing hearing is required. [A66-71].  This position, of course, was directly contrary to the government's (and the court's) expressed position during the previous three years since the case was remanded from the Court of Appeals.  All proceedings since the remand had been undertaken with the express understanding and agreement among the parties and the court that there would have to be a full *de novo* re-sentencing under the circumstances presented by this case.  On June 27, 2023, the court entered a Text Only Order transforming the July 6, 2023, re-sentencing date into a status conference.

On July 5, 2023, Mr. Orena filed his response to the government's June 26, 2023 letter [A72-86], explaining why even after *Pena* a full *de novo* resentencing was required and setting out some of the compelling changed circumstances, all documented in the record, since the 1993 sentencing that are directly relevant to sentencing factors under 18 U.S.C. §3553(a) and other appropriate sentencing considerations. On July 6, 2023, a status conference was held, during which, among other things, Mr. Orena adamantly insisted yet again that a *de novo* resentencing was required and why [A158].

On December 18, 2023, the court entered a Text Order setting another status conference. On the eve of the scheduled status conference, the government once again wrote to the court urging the court to decline to permit an evidentiary hearing in connection with any resentencing [ECF# 1952]. The status conference was held on February 1, 2024, and again, Mr. Orena adamantly argued that a full *de novo* resentencing was required, that anything less would be an abuse of discretion and unconscionable, and provided reasons [A208-42].

On March 20, 2024, the lower court entered its Memorandum and Opinion denying the request for *de novo* resentencing and concluding that imposing sentence after Count 8 was vacated was a "strictly ministerial" act, such that no resentencing at all would be provided [A246-53]. Also on March 20, 2024, an Amended Judgment was entered imposing the same sentence as was imposed in

11

1993, without any resentencing hearing or consideration of any of the changed circumstances that Mr. Orena had urged the lower court to consider in multiple written submissions and orally [Compare A243 with A254]. On March 28, 2024, Mr. Orena timely filed his Notice of Appeal [A259].

**B.      Statement of the Facts Relevant to the Issues Presented for Review:**

The relevant procedural facts are set forth above.  The underlying facts most relevant to the issues presented for review relate most directly to the changed circumstances which required a *de novo* resentencing in this case.  It is the undersigned's belief that the most effective way to present the relevant facts for the Court's review is to provide them in the context of the legal argument section of this brief, urging this Court to reverse the lower court's decision to deny the full *de novo* resentencing to which Mr. Orena was entitled and to remand the case for *de novo* resentencing.  Accordingly, the material facts relevant to the issues for review will be presented in the Argument section of this brief.

## SUMMARY OF THE ARGUMENT

After Count 8 of the operative indictment was vacated, Mr. Orena unquestionably was entitled to a *de novo* re-sentencing in light of the materially changed circumstances from the time of his original sentencing in 1993 to the present and in light of the fact that a new judge has been assigned to this case who was not previously in any way involved with the case.  The lower court clearly

abused its discretion in denying *de novo* re-sentencing. A *de novo* re-sentencing was required as a matter of law, under the circumstances presented by this case and the judgment below must be reversed with the case remanded for re-sentencing. The lower court's decision cannot be reconciled with this Court's decision in *Kaziu v. United States*, – F.4th –, 2024 U.S. LEXIS 17380, 2024 WL 3418238 (2d Cir., July 16, 2024) or with the United States Supreme Court's decision in *Concepcion v. United States*, 597 U.S. 481 (2022).

The case must be reversed and remanded for a *de novo* re-sentencing before a different district judge. *United States v. Woltmann*, 610 F.3d 37, 43 (2d Cir. 2010).

## ARGUMENT

**I.  The Lower Court Erred in Refusing to Provide De Novo Sentencing for Mr. Orena After a Count of His Conviction was Vacated and In Light of Material Changed Circumstances Since His Original Sentencing in 1993 and With a New Judge Assigned to His Case.**

**Standard of Review:**

The lower court's findings as to the extent of its authority in evaluating and deciding the motion is a legal issue, subject to *de novo* review. *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020); *United States v. Holloway*, 965 F.2d 660, 664 (2d Cir. 2020).

Its finding of facts are subject to an abuse of discretion standard of review. *United States v. Borden*, 564 F.3d 100, 104-105 (2d Cir. 2009); *Kaziu, Supra.*.

**When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction.** *Concepcion v. United States*, 597 U.S. 481, 486 (2022), citing, *Pepper v. United States*, 562 U. S. 476, 492 (2011).

**The Lower Court's Misplaced Reliance on *United States v. Pena*, 58 F.4th 613 (2d Cir. 2023) Was Reversible Error.**

On October 15, 2020, following the remand of this case from the Second Circuit to vacate Mr. Orena's conviction under Count 8 of the operative superseding indictment, the government filed a letter with the district court in which it engaged in a lengthy analysis of the issues surrounding the vacating of Count 8, which it concluded by advising the district court that as a matter of law the conviction under Count 8 had to be vacated and that the court had to provide a full *de novo* resentencing for Mr. Orena [ECF# 1852 at 7]. The government wrote:

> "Because Orena's Section 924(c) conviction is predicated on a crime of violence that qualifies only under the Residual Clause, Orena's conviction on this count must be vacated and a full resentencing on the remaining counts should take place. *See United States v. Powers*, 842 F.3d 177, 179 (2d Cir. 2016) (explaining that remedy for conviction error is remanding for *de novo* resentencing)."
> *Id*.

Indeed, this was the government's position in this case (joined in by the district court) at all times, repeatedly and consistently right up until the eve of the promised *de novo* re-sentencing hearing. *See e.g.*, "... the government has conceded that the firearm conviction cannot stand ..., requiring the Court to undertake a full *de novo* resentencing." [ECF# 1856].

14

Years later, on June 26, 2023, just before the scheduled *de novo* re-sentencing hearing, the government all of a sudden and without notice advised the court that it should not hold any re-sentencing at all and it should simply vacate Count 8 and impose the same sentence as was imposed in 1993, without any further inquiry or proceedings [A66-71].

The government purported to base its position on the decision from the Second Circuit in *United States v. Pena*, 58 F.4th 613 (2d Cir. 2023), handed down five months earlier. In *Pena*, this Court held that when a count of conviction is vacated pursuant to a §2255 motion, the district court on remand retains full authority to conduct a *de novo* re-sentencing, it need not do so in the exceptional case in which any new sentencing would be "strictly ministerial."

The *Pena* Court expressly noted that such discretion not to conduct a *de novo* re-sentencing "has limits" and that in most such cases re-sentencing would not be "strictly ministerial;" *Id*. at 623; but it gave no real guidance as to when to apply the exception. Nevertheless, the government seized on the exception and erroneously convinced the district court here that any re-sentencing in the instant case would be "strictly ministerial" and therefore, contrary to its position all along, the court should exercise its discretion to deny any re-sentencing [A66-71].

15

The district court, new to this case, erroneously bought into this misguided argument, completely misunderstanding the meaning of "strictly ministerial,[4]" among other errors, and simply re-imposed the same sentence Mr. Orena received in 1993,[5] completely ignoring the relevance to re-sentencing of the extraordinarily

---

[4] The lower court here in its Memorandum and Opinion found that it could decline resentencing altogther, let alone a full *de novo* resentencing because the imposition of a new sentence here, following the vacating of the §924(c) count would be "simply ministerial." [A246-53] It came to that conclusion based on reasons that simply are not cognizable under the appropriate inquiry for when a resentencing would be "strictly ministerial" and therefore was an abuse of the court's discretion.

As Judge Lynch explained in his concurring opinion in *Kaziu*, the very limited situation in which a resentencing when a count of conviction is vacated is "strictly ministerial" as contemplated by the *Pena* decision is only when "... the defendant is already serving the lowest sentence of each of his or her *remaining* convictions that is allowed by law." *Kaziu*, 2024 U.S. App. LEXIS at *31 (Lynch, J., concurring). That certainly is not the case here. Mr. Orena was sentenced to life imprisonment (and fined $2,000,000) when neither was by any means "the lowest sentence allowed by law." The term of imprisonment imposed was the highest permitted by law and there is no mandatory minimum at issue, as there was in *Pena*. Indeed, after more than thirty years in prison, Mr. Orena already has fully served the lowest sentence allowed by law for all of the remaining counts of conviction.

[5] The lower court reduced the fine imposed from the original $2,250,000 to $200,000,000 to account for the vacated count and the original sentencing that imposed a fine of $250,000 per count. The $200,000,000 fine was imposed by Judge Komittee consistent with his wholesale adoption of the original sentence imposed, notwithstanding the undisputed fact, as acknowledged by Probation, that Mr. Orena has no financial means after over thirty years in prison and is indigent. [A326] The Third Addendum indicates that the formal financial form provided to Mr. Orena's son was not returned, but that Mr. Orena's son attested to his indigence and Probation accepted that Mr. Orena is unable to pay a fine [A326]. It is not

changed circumstances surrounding Mr. Orena and this case since 1993 [A246-53]. In doing so, the district court committed reversible error, requiring a remand of this case for full *de novo* re-sentencing.

In *Pena*, the Court held that when a count of conviction is overturned on a successive §2255 motion, a full *de novo* resentencing hearing is not mandatory; rather it is, with limits, left to the district judge's discretion whether to "discharge the prisoner or resentence him or grant a new trial, or correct the sentence as may appear appropriate." *United States v. Bernard*, 2023 U.S. Dist. LEXIS 6804, *6, *citing* 28 U.S.C. §2255(b) (E.D.N.Y., January 13, 2023) (exercising its discretion in favor of full *de novo* resentencing).

The defendant in *Pena* was sentenced to five concurrent terms of life imprisonment, three of which carried mandatory sentences of life imprisonment and two of which (the §924(j) counts), were punishable by life imprisonment. *Pena*, 58 F.4th at 617. The court vacated the two §924 counts on a successive §2255 motion; however, on remand, the district court exercised its discretion to simply correct the sentence, rather than conduct a *de novo* resentencing, where the vacatur still left the defendant Pena with three counts that carried mandatory life sentences.

---

accurate that Mr. Orena's son failed to return the financial form. The undersigned personally provided it to the Probation officer; but it is *dehors* the record.

17

The Second Circuit affirmed, finding first, that under such circumstances, the district judge has discretion as to the remedy (based on 18 U.S.C. §2255(b)) and secondly, that where, as in the circumstances of that case, there would no sentencing discretion at any resentencing, since the counts that remained intact carried mandatory life sentences, any resentencing would be "strictly ministerial.[6]" Therefore, it was not an abuse of discretion to fail to a hold a full *de novo* resentencing under the operative circumstances. *Pena*, 58 F.4th at 615, 623. The Second Circuit noted, however, that the discretion to avoid a full *de novo* resentencing "has limits" and that "[I]t may be that in most cases in which resentencing would not be strictly ministerial, a district court abuses its discretion when it denies *de novo* resentencing." *Id*. at 623.

In Mr. Orena's case resentencing is in no way "strictly ministerial." There is no mandatory life sentence involved here. Moreover, he was sentenced under a Guidelines system that was mandatory at the time of his original sentencing. That no longer is the case and that clearly makes a major, significant difference. Mr. Orena must be resentenced under the advisory Guidelines system and with full

---

[6] In *Tellier v. United States*, 2023 U.S. App. LEXIS 12792, *4, 2023 WL 36008394 (2d Cir. May 24, 2023), the Court explained that for these purposes an example of a resentencing that would be "simply ministerial" or an "empty formality" is "when one or more of the sentences carry mandatory minimum sentences of life imprisonment...." *Id*. That certainly is not the case here.

18

consideration of the factors under 18 U.S.C. §3553(a) as he now stands before the Court. In failing to conduct a *de novo* resentencing in this case the lower court knowingly turned a blind eye to the §3553(a) factors and especially to the fundamental overriding principle that the sentence imposed must be sufficient, but no greater than necessary to satisfy the purposes of sentencing, based on all relevant factors that apply that day, as Mr. Orena now stands before the Court. *See* 18 U.S.C. §3553(a).

The failure to conduct a *de novo* sentencing meant knowingly ignoring material sentencing factors under §3553(a) and other fundamental sentencing principles, including the indisputable evidence of Mr. Orena's rehabilitation, model inmate behavior for during the more than 30 years he has served, his service to others and personal religious development, and the combination of all of these factors and others identified below. *see Pepper v. United States*, 562 U.S. 476, 491 (2011); *Russo*, 2022 U.S. Dist. LEXIS 213643 at *22.

**This Court's Decision in *Kaziu v. United States* Requires Vacating the Sentence and Remanding for Full *De Novo* Resentencing**

With its decision in *Kaziu v. United States*, – F.4th –, 2024 U.S. App. LEXIS 17380, 2024 WL 3418238 (2d Cir. July 16, 2024), a case squarely on all fours with the instant case, this Court clearly enunciated a rule which unquestionably demonstrates that the lower court here erred in denying the promised *de novo* re-sentencing for Mr. Orena. This Court in *Kaziu* held that it is

19

"fully an abuse of discretion" to decline to hold a full *de novo* resentencing when a count of conviction has been vacated through a §2255 motion and (1) the resentencing judge is not the original sentencing judge and (2) the defendant plausibly alleges changed circumstances. *Id*.

In the instant case, the first criteria is met - Judge Weinstein was the original sentencing judge in 1993 and Judge Komitee is the judge whose refusal to provide a *de novo* resentencing is at issue in this appeal. The changed circumstances alleged by Mr. Orena are more than plausible - they are all fully documented and supported by record evidence - and they are far more compelling and directly relevant to resentencing than the changed circumstances alleged in *Kaziu*.

**The *Kaziu* Decision**[7]:

At the age of 19, the defendant in the *Kaziu* his radicalization and embrace of militant jihadism and two years later moved to Egypt to study Arabic and "fight jihad"with the intention of killing U.S. troops and their allies. That same year he traveled to Kosovo to formulate a plan to kill Americans. *Kaziu*, 2024 U.S. App. LEXIS 17380, *3-*4. His plans were intercepted and a search of his apartment

---

[7] After *Kaziu* was decided, the undersigned contacted government counsel to see whether the government would agree to a remand for *de novo* resentencing and obviate the time and expense required for this email. Government counsel declined, advising that they believe the cases to be distinguishable. They are not.

revealed his plans and tools, including a recording of his plan to die for Allah. *Id.* at 4.

Kaziu was indicted in the Eastern District of New York and was transferred there to face indictment on four counts related to his terrorist murder plot. In 2011, he was convicted by a jury on all four counts and was sentenced to 27 years on one count and the statutory maximum 15 years on the other three counts and in 2014, his convictions and sentences were affirmed on direct appeal. *Id.* at 5.

In 2019, pursuant to Kaziu's §2255 petition, his firearm count under 18 U.S.C. §924 was vacated, just like Mr. Orena's, under the authority of *United States v. Davis*, 588 U.S. 445 (2019) and, as in Mr. Orena's case, the government adhered to its "long-held position that *de novo* resentencing was required for the remaining counts, requiring the court to "reconsider the sentences imposed on each count, as well as the aggregate sentence." *Id.* at *7 (citations omitted). As in the instant case, the government changed its position and argued against *de novo* resentencing based on the *Pena* decision. *Id.* at *8-*10.

The district judge agreed that no *de novo* resentencing was required and unilaterally decided to reduce the aggregate sentence from 27 years to 25 years, on written submissions and without any sentencing hearing, erroneously concluding that the *de novo* resentencing rule, previously urged by both parties, actually only applies when a conviction is vacated on direct appeal. *Id.* at *10-*12.

21

In sentencing Kaziu, the original sentencing judge provided carefully detailed support for the sentence imposed and stated that there was good reason to believe the defendant was ready, willing, and able to kill in the name of jihad and had decided to do just that. He also found that his expression of regret was "opportunistic" and that if given the chance, he would pick up where he left off and perhaps succeed with his jihadist plans. He found the sentence of 27 years to be required to incapacitate the "unrepentant jihadist" and gave no indication that the since-vacated firearms count had any independent relevance to the sentence imposed. *Id*. at *44-*45.

In concluding that the case had to be reversed and remanded for a full *de novo* resentencing, the Court in *Kaziu* based its decision on two factors:

First, the judge assigned to the case following the remand to vacate the firearm count was not the original sentencing judge. *Id*. at *17-*18

Secondly, the defendant "presented plausible allegations of changed circumstances that suggest(ed) that the original rationale underlying the sentence - that he was a committed and unredeemed terrorist - no longer appl(ied)." *Id*. at *18.

Both apply in full force in Mr. Orena's case and, indeed, his demonstrated "changed circumstances" from the time of his sentencing over 30 years ago are far

more compelling and time-proven than the "plausible changed circumstances" claimed by Mr. Kaziu in the 5 years since his original sentencing.

This Court in *Kaziu* noted that the judge then assigned to the case was different from the original sentencing judge and wrote that, while a new judge could perhaps hypothesize from sentencing record or the sentence itself, how the original judge felt about the relationship among the counts or other relevant sentencing factors, a "learned hypothesis is a weak substitute for direct knowledge ...." *Id*. at *17-*18.

This Court then considered the "plausible allegations of changed circumstances." They noted that Kaziu claimed that he had a prison disciplinary record free from infractions except for one fight, indicating he no longer had "violent tendencies;" he had changed his understanding of Islam from a radical interpretation to a personal understanding that made him less susceptible to "misinformation;" and he spent time in prison taking courses to better position himself to "be a productive member of society." These, this Court concluded, were sufficient allegations of changed circumstances "so that a district judge might wisely consider his arguments at a full *de novo* resentencing." *Id*. at *19-*20.

This Court concluded that having a new judge assigned to the case in tandem with "plausible allegations of changed circumstances" requires that a full *de novo*

23

resentencing be conducted and the failure to do so is an abuse of discretion. *Id*. at
*20.

This Court vacated the sentence in *Kurziu* and remanded it for *de novo*
resentencing. This Court further noted that the procedural protections required for
a resentencing are no different from the full panoply of protections required for an
initial sentencing and ordered the same. *Id*. at *21.

### Applying The Decision in *Karziu* to Mr. Orena's Case

There is no question that resentencing judge was not the same here as the
original sentencing judge.

The changed circumstances Mr. Orena presented to the district court are far
more compelling and directly relevant to sentencing considerations than the
changed circumstances alleged in *Karziu* and in Mr. Orena's case, they are
demonstrable, not merely "plausible."

**Changed Circumstances Since Mr. Orena's 1993 Sentencing:**

At the time of his original sentencing in 1993, Mr. Orena was an active 58
year old man, alleged to be the acting boss of the Colombo organized crime family.

Today he is 90 years old, confined to a wheelchair, unable to manage his
daily hygiene or other tasks or move around without assistance. His medical
condition is deemed "terminal," supported by voluminous medical records filed
under seal with the lower court and attested to by prison officials, as reflected in

24

the Third Addendum in summary form. [A321-324]. He suffers from advanced and rapidly progressing Alzheimer's/Dementia, which renders him unaware of who he is or where he is most of the time and he recently was brutally attacked by another inmate in his mental health unit and was unable to defend himself.[8] Accordingly, he is considered to be in a debilitated medical condition (within the meaning of BOP Policy Statement 5050.50 <u>Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)</u>, section 3(b)). Under the Sentencing Guidelines, Mr. Orena's condition is deemed "terminal." Note 1.(A)(i) of the Commentary to U.S.S.G. § 1B1.13 (2018).[9]

---

[8] Both parties filed somewhat voluminous documents under seal in the district court in connection with the §3582 motion litigation, primarily due to the sensitive medical conditions involved. It is the undersigned's understanding that this Court can gain access to those sealed documents if it so desires. The specifics of his medical conditions, apparent from the sealed documents, are just presented in summary form here. [*See also*, Appendix in Docket No. 21-2747 at A99-108].

[9] Under §3553(a)(2)(D), the court is to consider the need to provide the defendant with medical care in the most effective manner. Surely, at 90 years old and with the terminal and otherwise serious multitude of medical conditions under which Mr. Orena suffers, he should not be evaluated in the same way today as 31 years ago. *See United States v. Beck*, 425 F. Supp. 3d 573, 580 (M.D.N.C. 2019).

Under §3553(a)(2)(A)&(B), the court is consider what punishment is sufficient, but not greater than necessary to "provide just punishment" and to "afford adequate deterrence." Is the need to deter or to punish the same today for this 90 year old man who has such advanced dementia that he does not know who or where he is, who is confined to a wheelchair, and who is unable to care for

He has been incarcerated for over 31 years and there is no evidence of any organized crime ties or contact over that entire period. He has a perfect institutional record. There is no evidence that Mr. Orena poses any danger to the safety of any other person or to the community, especially in light of his serious medical conditions and his institutional record. The Bureau of Prisons has formalized a risk of violence assessment program, based on comprehensive criteria preceding and including the inmate's time of incarceration. https://www.ojp.gov/pdffiles1/nij/256084.pdf . The BOP performed its formal risk assessment on Mr. Orena on April 28, 2021 and concluded that his risk for violence is at the lowest level: **"Minimum"** [Exhibit 2 to unredacted, sealed version of ECF# 1864].

Mr. Orena also has an excellent institutional record with undisputed evidence of his efforts helping youth at risk, through the NAACP and others and

---

himself at all? Consider, additionally that Mr. Orena has served approximately 380 months in prison. According to the U.S. Sentencing Commission over the past 4 years the median sentence for murder in federal court is between 180-260 months. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2017_Quarterly_Report_Final.pdf;

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_FY19.pdf

bettering himself, including receiving his ordination as a minister, before the onset of dementia [ECF# 1864 at 7].

Mr. Orena submitted an ideal home plan to the district court in connection with his motion for compassionate release, supported by letters from loving family members [ECF# 1864-1].  The record below reflects his conduct over the past 30 years, demonstrating vastly changed circumstances from the time of his 1993 sentencing.

At the time of his original sentencing in 1993, the Sentencing Guidelines were mandatory; they are now advisory (and there is no statutory mandatory minimum applicable here).[10]

His co-defendants about whom other judges in the same district wrote scathing denunciations concerning their violence and organized crime leadership roles and activities, have been released from prison.[11]  *See* 18 U.S.C. §3553(a)(6).

---

[10]  *See e.g., United States v. Birkett*, 2023 U.S. Dist. LEXIS 112714, *18-*19 (E.D.N.Y., June 29, 2023) (noting the significance of the Guidelines status as advisory and not mandatory after *United States v. Booker*, 543 U.S. 220 (2005); under the mandatory Guidelines system, the inability to consider all attending circumstances into account was in conflict with the command under 18 U.S.C. §3553(a) to consider whether the punishment of life imprisonment was "no greater than necessary" to satisfy the purposes of sentencing or created a disparity among defendants with similar records who committed similar conduct.).

[11]  *See e.g., United States v. Russo*, 2022 U.S. Dist. LEXIS 213643, *17-*18, 2022 WL 17247005 (E.D.N.Y., November 28, 2022) (noting impact of non-mandatory status of Guidelines and sentencing disparities in reducing Mr. Orena's co-

Mr. Orena has already more than served the entirety of the sentences imposed by Judge Komitee on most of the remaining counts.

Finally, there is abundant evidence that has surfaced since Mr. Orena's 1993 original sentencing that completely undermines sentencing findings Judge Weinstein made about him, his conduct, the risk he posed, and other sentencing factors. The lower court refused to consider this evidence, relying at all times instead wholly on Judge Weinstein's original sentencing order. Such evidence of course is independently relevant to the integrity of Mr. Orena's conviction and to that extent can, and will be raised in a §2255 petition as indicated in the district court. But it is also directly relevant to sentencing factors and completely undermines key sentencing conclusions Judge Weinstein came to in 1993, when he imposed sentence and even after denying post-conviction motions; for much of the most compelling information has only surfaced in the years since Judge Weinstein considered those post-conviction motions.

---

defendant's sentence, notwithstanding his life sentence and alleged leadership role in the Colombo family and in orchestrating at least two murders). *See also, United States v. Monteleone*, 2023 U.S. Dist. LEXIS 62518, 2023 WL 2857559 (E.D.N.Y., April 10, 2023) (reducing Mr. Orena's co-defendant's sentence of multiple life imprisonment terms for multiple murders to time served, noting mandatory nature of Guidelines at the time of the original sentencing and sentencing disparities; noting Anthony Russo's leadership role in the Colombo family).

The following are examples of this new evidence that clearly is relevant to sentencing and that undermines the information Judge Weinstein had at the original sentencing in 1993.[12] [*See also* ECF# 1869].

As judges in the Eastern District of New York have noted, the original sentencing of this group of defendants was based on information then known to the Court which has been materially undermined by evidence uncovered since, much of which had been intentionally and unethically withheld by the government. *See e.g., United States v. Monteleone*, 2022 U.S. Dist. LEXIS 213643 at *10, n.6;[13] [See ECF# 1869, incorporated herein].

---

[12] The materials on this subject filed in the district court are voluminous and would unduly burden the record herein to include all in the Appendix. See e.g. ECF# 1869 & 1896-1 through 1869-5.

[13] "The government did not disclose at trial that co-conspirator Gregory Scarpa, Sr., ... was an informant for the FBI working with Supervisory Special Agent Roy Lindley Devecchio. Despite committing many of the murders that occurred as part of the Colombo Crime Family War, Scarpa was not indicted. DeVecchio was later unsuccessfully charged with murder for his role in allegedly assisting Scarpa in four killings." *Id.* (Block, J.).

In 1997, Chief Judge Sifton wrote a lengthy decision laying out the outrageous details of the corrupt relationship between Scarpa and the FBI that had been withheld by the government. What Chief Judge Sifton knew then only scratched the surface of the breadth and depth of that corruption and the crimes Scarpa and Devecchio committed. *United States v. Persico*, 1997 U.S. Dist. LEXIS 23290, 1997 WL 867788 (E.D.N.Y., March 13, 1997). The Second Circuit reversed Chief Judge Sifton's decision setting aside the convictions because of the misconduct, finding that the misconduct did not meet the standard for setting aside the convictions; but his fact-finding was not undercut. *United States v. Orena*, 145

29

Among other things, Judge Weinstein relied on uncharged and unproven conduct to justify the life sentences he imposed. Overwhelming evidence uncovered since that original sentencing over 30 years ago has surfaced that directly undermines those findings as to uncharged and unproven "relevant conduct." This is evidence the lower court found it had no authority to consider in the context of Mr. Orena's compassionate release motion. It was a grave injustice to Mr. Orena and his family, and to the integrity of the sentencing process and the principles reflected in 18 U.S.C. §3553(a) to ignore this evidence now, when the Court has full authority and the opportunity to conduct a *de novo* resentencing of Mr. Orena as he now stands before the Court.

Since the time of Mr. Orena's conviction, the prosecution of the so-called Colombo War cases has been exposed as the single most corrupt prosecution in the history of our criminal justice system. Court opinions, articles, books, and

---

F.3d 551 (2d Cir. 1998). Those findings included not just that the government concealed Scarpa's informant status from the defendants, but that Scarpa falsely attributed to others several murders with which he was involved. *See United States v. Monteleone*, 2023 U.S. Dist LEXIS 62518 at *4 (E.D.N.Y., April 10, 2023).

*See also,* November 20, 2012 Hearing Transcript in *Scarpa v. United States*, 02-cv-3953 (ERK) at 6: Judge Korman: "And it was my view and remains my view that Lin Devecchio provided information to Scarpa that got people killed ... I found it pretty outrageous and the bottom line was, of course, nothing happened to Lin Devecchio ...." "People outside of government are basically shocked when I tell them this is basically the story ...."

documentaries have been written and made about the corruption and ethical violations that marked the prosecution in this case and all related cases.[14]  In 2005, the FBI cited the corrupt relationship in this case in its report on guidelines for interacting with cooperating witnesses as a result of what went on between the lead FBI agent Devecchio and notorious mob hit man Gregory Scarpa, that included literally giving their vicious, murdering, source of information, Scarpa, license to kill.  https://oig.justice.gov/sites/default/files/archive/special/0509/chapter3.htm (See especially Section III. D. and Case Study 2).

The lead FBI agent, Devecchio, was indicted for multiple murders directly related to these cases.  Devecchio was exposed as having picked sides and he celebrated murders, while providing information to Scarpa in order to facilitate the

---

[14]  https://www.newyorker.com/magazine/1996/12/16/the-g-man-and-the-hit-man?irclickid=wJ4VAl1VpxyORwmwUx0Mo38QUkBWXDzxQyJWRU0&irgwc=1&source=affiliate_impactpmx_12f6tote_desktop_Bing%20Rebates%20by%20Microsoft&utm_source=impact-affiliate&utm_medium=2003851&utm_campaign=impact&utm_content=Logo&utm_brand=tny

 https://nypost.com/2007/01/14/gangland-g-man-sent-rat-into-trap/

Peter Lance, *Deal With the Devil, The FBI's Secret Thirty-Year Relationship with a Mafia Killer* (Morrow 2013).

https://www.nytimes.com/2006/03/30/nyregion/exfbi-agent-accused-of-role-in-four-organized-crime-killings.html

http://www.usa-the-republic.com/items%20of%20interest/Win_At_All_Cost/Switching_sides.htm

murders. And the prosecution was a part of it all, knowingly withholding evidence of the corrupt relationship between Devecchio and Scarpa in what then Chief Judge Sifton characterized as a "reprehensible" and "myopic withholding of evidence" (referring specifically to then AUSA Andrew Weissmann's conduct).[15]" At the time Judge Sifton made that finding, the revelations of corruption had not even scratched the surface of what actually transpired.

Tellingly, following the disclosure of the corruption evidence, and the decision by Judge Korman that such evidence was relevant for a jury to hear, well after Mr. Orena's conviction in the instant case, defendant after defendant in the so-called Colombo war prosecutions was acquitted, including Mr. Orena's own sons. *See United States v. Orena et al.*, 93 cr 1366 (ERK); *see also* [ECF# 1869-1]. Indeed, 4 different juries acquitted all defendants in the Colombo cases in which the jury learned about the corruption that was concealed from the jury in Mr. Orena's case. Just a few years ago, Judge Korman finally openly expressed the obvious in no uncertain terms - FBI agent Devecchio clearly was providing information to Scarpa to facilitate the murders he was committing.

---

[15] *See United States v. Theodore Persico, Jr. et al.*, CR-92-0351 (CPS), Memorandum and Order of February 18, 1997. In Chief Judge Sifton's original decision, he singled out AUSA Andrew Weissmann for his particularly unethical behavior. Then U.S. Attorney Zachary Carter wrote to the Chief Judge, asking him to remove Weissmann's name. Chief Judge Sifton complied and the final reported version omits Weissmann's name.

https://www.nydailynews.com/new-york/nyc-crime/brooklyn-judge-fbi-agent-aided-mob-hits-article-1.2488378

Consider as well the following excerpt from the presiding judge's 2007 decision in *People v. Devecchio*, 2007 N.Y. Misc. LEXIS 7827, *4-*4 (Kings Co. Sup. Ct., Nov. 1, 2007):

> "It is certainly true that through the years, Greg Scarpa provided valuable and, in some instances, unique information on the workings and structure of the organized crime families in New York and the Columbo family in particular. Interestingly, and perhaps inexplicably, Scarpa provided information not only on others, but also on his own son, Greg Scarpa Jr., and, indeed, on himself as well. Scarpa readily admitted to his own involvement in loan-sharking, gambling and bank burglaries. He informed on rivals and those closest to him, including members of his own crew. And in keeping with his treacherous nature, he also provided information to the FBI that was purposely deceptive and untrue in an attempt to point the finger of accusation away from his own misdeeds and on to that of gang rivals. He provided information on the murder of Joe "Brewster" DeDomenico and the attempt to kill Joe "Waverly" Cacace without indicating that he himself was involved in both. Similarly, he blamed on others the murder of Nicky "Black" Grancio that he had committed. On the limited evidentiary record provided to the Court, it is impossible to determine how much of Scarpa's information was accurate and valuable and how much was not.
>
> What is undeniable was that in the face of the obvious menace posed by organized crime, the FBI was willing, despite its own formal regulations to the contrary, to make their own deal with the devil. They gave Scarpa virtual criminal immunity for close to 15 years in return for the information, true and false, he willingly supplied. Indeed, this Court is forced to conclude that Scarpa's own acknowledgment of criminal activity to the FBI could only be explained by his belief that the agency would protect him from the consequences of his own criminality, which the record suggests is what they did.

33

Not only did the FBI shield Scarpa from prosecution for his own crimes, they also actively recruited him to participate in crimes under their direction. That a thug like Scarpa would be employed by the federal government to beat witnesses and threaten them at gunpoint to obtain   information regarding the deaths of civil rights workers in the south in the early 1960s is a shocking demonstration of the government's unacceptable willingness to employ criminality to fight crime. It is redolent of the current mindset of some in the government who argue that the practice of terror and torture can be freely employed against those the government claims are terrorists themselves: that it is permissible to make men scream in the name of national security. These are shortcuts that devalue legitimate polite work, their yield is insignificant and the cost to the fundamental values they debase is enormous."

Devecchio has now openly admitted knowing full well that Scarpa was committing murders while on the street acting as his informant.

https://www.youtube.com/watch?app=desktop&v=btQkfCyd6Lw

*See also*, [ECF# 1869-2 - Report of the Special District Attorney In the Matter of the Investigation of Linda Schiro by Judge (ret.) Leslie Crocker Snyder.

In his testimony at an evidentiary hearing in Mr. Orena's case, Devecchio lied and adamantly denied this.  Of course, he still has not admitted his own direct role in multiple murders which went far beyond just facilitating them by providing information.  Devecchio's far more directly involved roles have been described to me in detail by Gregory Scarpa, Jr., even at the cost of putting himself into the murders for which he never was even a suspect.

ECF# 1869-3, incorporated herein, is the Brooklyn District Attorney's submission to the Kings County Supreme Court, pursuant to *People v. Molineux*,

168 N.Y. 264 (1901), describing just some of Devecchio's conduct in relation to murders and other illegal activity during the so-called Colombo War. This is all information that was withheld from Mr. Orena and the jury that heard his case.

All of this evidence and much more was withheld from Mr. Orena in his prosecution and it completely undercuts the integrity of the sentence imposed. It is inconceivable how, in fairness, the government could have failed even to make reference to this unprecedented corruption when asking the Court to rely on the conviction and sentence in denying Mr. Orena's compassionate release.

The corruption and illegal/unethical withholding of evidence did not just stop with the concealment of the Devecchio/Scarpa relationship that was driving the war and that was responsible for most of the murders that occurred.

The corruption and illegal/unethical withholding of evidence did not just stop with the concealment of the Devecchio/Scarpa relationship that was driving the war and that was responsible for most of the murders that occurred.

More recently, evidence of additional government misconduct has surfaced and was provided to the district court that directly and completely undermines the integrity of the charge that Mr. Orena killed Thomas Ocera, the primary charge accounting for the life sentence.

Mr. Orena has vehemently denied his involvement in this crime at all times. We now know that the prosecution had strong reason to believe Mr. Orena was not

at all involved in the Ocera murder and that he did not even know how, why, or by whom Mr. Ocera was killed. [ECF# 1869-4]  But again, the district court affirmatively refused to consider this extraordinary evidence of changed circumstances.

One of the government's Top Echelon Confidential Informants, Frank Sparaco, an admitted organized crime member, has come forward and has revealed to Mr. Orena that while working for the government on the Colombo prosecutions, he regularly was encouraged to lie and his lies were knowingly facilitated by the government.  Sparaco also was given free rein by the government to commit murders, including murders charged as so-called Colombo War murders.[16]

But the most directly relevant revelation by Sparaco for the instant purposes related to the Ocera murder and it was supported by an exculpatory report of investigation Sparaco recently provided, which at all times had been withheld by the government.  As reflected in the report of investigation, memorializing an interview with Sparaco on "12/4/89," Sparaco told the government in no uncertain terms well before Mr. Orena's trial for the Ocera murder, that John Gotti, not Mr. Orena, had "authorized the OCERA 'hit'" and that it was "without permission of

---

[16]  Sparaco provided a detailed account of the corruption he witnessed and the license to kill he was given by the government.  It was provided to Judge Weinstein with a letter to the court from Mr. Orena's son [ECF# 1829] and remains under seal [ECF# 1830, attachment #1].

the hierarchy of the COLOMBO LCN family" (which was alleged to include Mr. Orena). Sparaco explained to the government the reason Gotti had Ocera killed (having nothing to do with Mr. Orena) and he further advised that the Colombo family was actually "very uneasy" about the murder. [ECF# 1869-4].

Interestingly, with respect to the government's assertion in its response in opposition to the compassionate release motion that there were 12 people killed in the Colombo War [A52; A60], a finding the district court adopted [A152], according to Frank Sparaco, the FBI knew full well that he (and Scarpa) were committing murders while acting as informants and, in fact, Devecchio put them on the street specifically to kill so that the Persico faction would have complete control of the Colombo family. Sparaco specifically wrote that he and Scarpa killed 12 people on that agenda. [ECF# 1830 - sealed attachment #1] One of the prosecutors on the instant case reportedly was forced to disclose what it knew about three Colombo War murders Sparaco committed in 2011.

https://www.nydailynews.com/news/crime/colombo-crime-fam-hit-man-frankie-blue-eyes-sparaco-lied-killed-fbi-informant-article-1.956248

There are many more relevant facts that have been discovered in recent years that further undermine the integrity of Mr. Orena's conviction and, indeed, the government's whole theory of prosecution. As mentioned above, defendant after defendant who faced trial after Mr. Orena for a role in the so-called Colombo

War cases was acquitted once his jury learned about the corruption that marked

these prosecutions.  There is every reason to believe that would have been the case

for Mr. Orena as well, had this evidence not been withheld and, in some instances,

directly lied about by the government and its witnesses.  There is a great deal more

compelling evidence undermining the government's whole narrative and reflects

extraordinary changed circumstances since Mr. Orena's 1993 original sentencing.

## II. On Remand, This Case Should Be Assigned to a Different District Judge for the Full *De Novo* Resentencing.

Mr. Orena respectfully submits that when this Court remands this case for

the full *de novo* resentencing to which he is entitled, the Court should do so with

instructions that the case be assigned to a different district judge.

Repeatedly during the course of the pleadings below, Judge Komitee has

made clear that he intends in all regards to rely on Judge Weinstein's 1993

sentencing related findings, notwithstanding the abundant demonstrable evidence

of materially changed circumstances, as described above, that undermine those

findings and that are directly relevant to an evaluation of the requisite sentencing

analysis under 18 U.S.C. §3553(a).

Indeed, he has repeatedly refused to acknowledge not just their direct

relevance to sentencing, but also that much of this evidence only surfaced after

Judge Weinstein made his sentencing findings and denied post-conviction motions.

In this regard, Judge Komitee is just plain wrong and consistently has repeated this

error despite being directed to the record and the relevant dates. [A250-252] It is indisputable, as the dates above make clear, that much of the most compelling evidence that undermines the original sentencing conclusions and Judge Weinstein's understanding of Mr. Orena's conduct and role only surfaced years after Judge Weinstein's last review of any matter presented to him. Moreover, Judge Komitee has made clear that, in any event, he is locked into adopting Judge Weinstein's view, rather than proceeding in the manner the law requires - viewing the defendant at sentencing as he then appears before the court.

Judge Komitee also has made clear that he already has concluded that Mr. Orena's terminal medical condition and associated limitations do not and could not alter his sentencing evaluation and judgment that the original sentence should remain imposed [A249].

For these and other reasons, the record reflects a situation in which it appears that the district court judge would "reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous." *United States v. Woltmann*, 610 F.3d 37, 43 (2d Cir. 2010); *United States v. Hernandez*, 604 F.3d 48, 55-56 (2d Cir. 2010). Reassignment also is "advisable to preserve the appearance of justice" and the reassignment would not involve any waste or duplication that could

39

possible outweigh interest in and the appearance of fairness which the reassignment would promote. *Id*.

## **CONCLUSION**

This sentence in this case must be vacated with the case remanded for full *de novo* resentencing in a manner that sentences Mr. Orena as he stands before the court on the day of sentencing, with evidence of all of the relevant circumstances that have changed since 1993 to arrive at a sentence that appropriately addresses all §3553(a) factors as they now apply. In light of the firmly and repeatedly expressed belief by the current district judge that the original sentence should not be changed, Mr. Orena would respectfully ask the Court to instruct the lower court to assign this case to a different district court judge on remand for purposes of the full *de novo* resentencing.

Dated:   August 2, 2024    /s/ David I. Schoen
David I. Schoen
DAVID I. SCHOEN,
  ATTORNEY AT LAW
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

*Counsel for Appellant Victor J. Orena*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.    This brief complies with the type-volume limitation because:

    this brief contains <u>9,813</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

Dated:   August 2, 2024        <u>/s/ David I. Schoen</u>
                                David I. Schoen
                                DAVID I. SCHOEN,
                                   ATTORNEY AT LAW
                                2800 Zelda Road
                                Suite 100-6
                                Montgomery, AL  36106
                                (334) 395-6611

                                *Counsel for Appellant Victor J. Orena*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on the 2nd day of August, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System.

I further certify that, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, United States Court of Appeals for the Second Circuit, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007

Dated:   August 2, 2024    /s/ David I. Schoen
David I. Schoen
DAVID I. SCHOEN,
  ATTORNEY AT LAW
2800 Zelda Road
Suite 100-6
Montgomery, AL  36106
(334) 395-6611

*Counsel for Appellant Victor J. Orena*

42