# 23-7133(L)

## 24-835(CON)

*To Be Argued By*:
DEVON LASH

# United States Court of Appeals

### For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

PASQUALE AMATO, CARMINE SESSA, LAWRENCE A. FIORENZA, LAWRENCE MAZZA, JOSEPH RUSSO, also known as JO JO, ANTHONY RUSSO, also known as CHUCKIE, ROBERT ZAMBARDI, also known as BOBBY ZAM, JOSEPH MONTELEONE SR., also known as JOE MONTE SR., ALPHONSE PERSICO, also known as ALLIE BOY, JOSEPH TOMASELLO, also known as JOE T, THEODORE PERSICO, also known as TEDDY, RICHARD FUSCO, also known as RICHIE, JAMES DELMASTRO, also known as JAMES DELMASTRO,

*Defendants,*

MICHAEL SESSA, VICTOR J. ORENA, also known as
VICTOR J. ORENA, also known as LITTLE VIC,

*Defendant-Appellant.*

_____

**On Appeal From The United States District Court
For The Eastern District of New York**

---

**BRIEF AND APPENDIX FOR THE UNITED STATES**

---

BREON PEACE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

NICHOLAS J. MOSCOW
DEVON LASH,
*Assistant United States Attorneys,
Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT ....................................................... 1

STATEMENT OF FACTS .................................................................3

    I.    Background ........................................................................3

        A.    Offense Conduct ............................................................3

        B.    Sentencing ......................................................................9

        C.    Direct Appeal ...............................................................10

        D.    Post-Conviction Proceedings.......................................11

            1.    Section 2255 Petition .........................................11

            2.    Rule 60(b) Motion...............................................14

            3.    Second Section 2255 Petition.............................15

        E.    Motion for Compassionate Release.............................16

        F.    Request for Resentencing ...........................................19

SUMMARY OF ARGUMENT ....................................................... 26

ARGUMENT -- IT WAS WITHIN THE DISTRICT COURT'S
DISCRETION NOT TO HOLD A DE NOVO RESENTENCING ..........27

    I.    Standard of Review ....................................................... 27

    II.    Applicable Law............................................................... 28

    III.    Discussion....................................................................... 32

A.    Judge Komitee Correctly Exercised His
Discretion in Concluding a De Novo
Resentencing Was Not Necessary ................................ 32

B.    This Court's Decision in <u>Kaziu</u> Does Not
Require a De Novo Sentencing ..................................... 38

1.    New Sentencing Judge......................................... 38

2.    Changed Circumstances ..................................... 42

C.    Remand to a Different District Court
Judge Is Not Warranted ............................................. 50

CONCLUSION ............................................................................. 53

iii

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

Anderson v. City of Bessemer City, N.C.,
   470 U.S. 564 (1985)..................................................................27

Ayyad v. United States,
   No. 16-CV-4346 (LAK),
   2020 WL 5018163 (S.D.N.Y. Aug. 24, 2020) .......................31

Gonzalez v. United States,
   792 F.3d 232 (2d Cir. 2015) .................................................27

Grancio v. DeVecchio,
   572 F. Supp. 2d 299 (E.D.N.Y. 2008)..................................47

Kaziu v. United States,
   108 F.4th 86 (2d Cir. 2024).......................................... passim

Orena v. United States,
   956 F. Supp. 1071 (E.D.N.Y. 1997).......................... 12, 13, 45

Orena v. United States,
   No. 97-2277 (2d Cir. Apr. 20, 1998) ...................13-14, 44-45

Orena v. United States,
   299 F. Supp. 2d 82 (E.D.N.Y. 2004) ...............................14-15

Russo v. United States,
   No. 03-CV-2059 (CPS),
   2004 U.S. Dist. LEXIS 32534 (E.D.N.Y. Nov. 24, 2004).....................15

Tellier v. United States,
   No. 21-2959,
   2023 WL 3608394 (2d Cir. May 24, 2023).................... 21, 29, 34, 35-36

United States v. Amato,
   48 F.4th 61 (2d Cir. 2022)........................................... passim

United States v. Antney,
   No. 17-CR-229 (CBA),
   2021 WL 4502478 (E.D.N.Y. Sept. 30, 2021) ............................... 18, 51

United States v. Ayyad,
   No. 20-3832,
   2023 WL 1975682 (2d Cir. Feb. 14, 2023) ................................... passim

United States v. Bradley,
   812 F.2d 774 (2d Cir. 1987) .......................................................... 50, 52

United States v. Brennan,
   395 F.3d 59 (2d Cir. 2005) ............................................................ 50, 51

United States v. Davis,
   588 U.S. 445 (2019) ........................................................................ 2, 15

United States v. Gordils,
   117 F.3d 99 (2d Cir. 1997) ................................................................... 28

United States v. Gordon,
   156 F.3d 376 (2d Cir. 1998) ................................................................. 27

United States v. Jones,
   114 F.3d 896 (9th Cir. 1997) ............................................................... 28

United States v. Malpeso,
   115 F.3d 155 (2d Cir. 1997) ........................................................... 44, 48

United States v. Monteleone,
   257 F.3d 210 (2d Cir. 2001) ................................................................. 44

United States v. Moore,
   83 F.3d 1231 (10th Cir. 1996) ............................................................. 28

United States v. Orena,
   32 F.3d 704 (2d Cir. 1994) ........................................................... passim

United States v. Orena,
   145 F.3d 551 (2d Cir. 1998) ........................................................... 44, 47

v

United States v. Persico,
   164 F.3d 796 (2d Cir. 1999) ........................................................ 44, 48

United States v. Peña,
   58 F.4th 613 (2d Cir. 2023) ....................................................... passim

United States v. Powers,
   842 F.3d 177 (2d Cir. 2016) ............................................................... 20

United States v. Quintieri,
   306 F.3d 1217 (2d Cir. 2002) ........................................................... 30

United States v. Robin,
   553 F.2d 8 (2d Cir. 1977) ............................................................ 50-51

United States v. Savoca,
   596 F.3d 154 (2d Cir. 2010) ............................................................. 34

United States v. Sessa,
   711 F.3d 316 (2d Cir. 2013) ....................................................... 44, 47

United States v. Sessa,
   821 F. Supp. 870 (E.D.N.Y. 1993) ........................................... passim

United States v. Vargas,
   961 F.3d 566 (2d Cir. 2020) ............................................................. 50

Yick Man Mui v. United States,
   614 F.3d 50 (2d Cir. 2010) ............................................................... 27

## STATE CASES

People v. Devecchio,
   2007 N.Y. Misc. LEXIS 7827 (Sup. Ct. Kings Cnty. Nov. 1, 2007) ..... 46

## FEDERAL STATUTES

18 U.S.C. § 892 .......................................................................................... 6

18 U.S.C. § 894 .......................................................................................... 6

18 U.S.C. § 922(g)(1) .................................................................6

18 U.S.C. § 924(c) ............................................................. passim

18 U.S.C. § 1959 ...............................................................6, 15

18 U.S.C. § 1962 .......................................................................6

18 U.S.C. § 3551 .....................................................................33

18 U.S.C. § 3553(a) ........................................................... passim

18 U.S.C. § 3582(c) .....................................................3, 16, 19

28 U.S.C. § 2241 .............................................................. passim

28 U.S.C. § 2255 .............................................................. passim

## STATE STATUTES

New York Penal Law § 20.00 ..................................................6

New York Penal Law § 105.15 ................................................6

New York Penal Law § 125.25 ................................................6

## RULES

Federal Rule of Criminal Procedure 33 ..............................9, 11

Federal Rule of Criminal Procedure 43 .............................28-29

Federal Rule of Criminal Procedure 60 ...........................14, 22

## SECONDARY SOURCES

George James, Killing Tied to Mafia War in Brooklyn,
   N.Y. Times, Dec. 9, 1991...................................................5

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-7133(L), 24-835(CON)

───────────────

UNITED STATES OF AMERICA,

Appellee,

-against-

PASQUALE AMATO, CARMINE SESSA, LAWRENCE A. FIORENZA,
LAWRENCE MAZZA, JOSEPH RUSSO, also known as JO JO, ANTHONY RUSSO,
also known as CHUCKIE, ROBERT ZAMBARDI, also known as BOBBY ZAM,
JOSEPH MONTELEONE SR., also known as JOE MONTE SR., ALPHONSE PERSICO,
also known as ALLIE BOY, JOSEPH TOMASELLO, also known as JOE T,
THEODORE PERSICO, also known as TEDDY, RICHARD FUSCO,
also known as RICHIE, JAMES DELMASTRO, also known as JAMES DELMASTRO,

Defendants,

MICHAEL SESSA, VICTOR J. ORENA, also known as VICTOR J. ORENA,
also known as LITTLE VIC,

Defendant-Appellant.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES

## PRELIMINARY STATEMENT

Defendant-appellant Victor Orena appeals from a memorandum and order and amended judgment entered on March 20,

2

2024, in the United States District Court for the Eastern District of New York (Komitee, J.).  The district court denied Orena's motion for a de novo resentencing after one of his nine counts of conviction was vacated pursuant to United States v. Davis, 588 U.S. 445 (2019), instead simply striking the five-year sentence attendant to that conviction while leaving intact the multiple life sentences previously imposed.  (A:246, 254).[1]

As shown below, Orena's arguments are meritless, and the district court's order should be affirmed.

---

[1] "A," "Br.," and "GA" refer to Orena's appendix, his brief, and the government's appendix, respectively.  "PSR" refers to the Revised Pre-Sentence Investigation Report dated May 24, 2023, prepared by the U.S. Probation Office ("Probation"), filed separately under seal. References to "DE" are to the docket entries in United States v. Orena, No. 92-CR-351 (E.D.N.Y.).

## STATEMENT OF FACTS

I.   Background[2]

    A.   Offense Conduct

In the early 1970s, Orena began associating with the Colombo organized crime family of La Cosa Nostra (the "Colombo Family"). (PSR ¶ 35). La Cosa Nostra, also known as the Mafia, includes five New York families—the Bonanno, Colombo, Gambino, Genovese, and Lucchese families—each headed by a boss. Orena was inducted as a member of the Colombo crime family in 1977. (Id. ¶ 35).

By 1988, Carmine Persico, the official boss of the Colombo Family despite being incarcerated, appointed Orena the family's acting boss. (Id. ¶ 36); United States v. Orena, 32 F.3d 704, 708 (2d Cir. 1994) (hereinafter "Orena Direct Appeal") (noting trial testimony established this occurred between 1988 and 1990). However, Persico and Orena agreed that Orena would step down as acting boss when Persico's son Alphonse "Little Allie Boy" Persico was released from federal prison, so

---

2       Much of the background, and some of the argument, in Orena's brief on appeal, and accordingly in this brief, recites materials previously provided to this Court in Orena's appeal from the denial of his motion for compassionate release under 18 U.S.C. § 3582(c). See United States v. Orena, No. 21-2747 (2d Cir.), Docket Nos. 33, 49, 57, 75, 79.

that Alphonse Persico could assume control of the Colombo Family. (PSR ¶ 37). Discord marked Orena's leadership of the Colombo Family. Several members of the crime family testified in various trials that Orena retained an "excessively large share" of the crime family's criminally derived proceeds at the expense of other members. (Id. ¶ 38).

Then, in the early 1990s, when Alphonse Persico was released from prison and sought to take control of the Colombo Family as anticipated, Orena refused to cede leadership, igniting an internecine war within the Colombo Family. (Id.); Orena Direct Appeal, 32 F.3d at 708. On one side were those loyal to Orena, who supported his elevation to official boss; on the other were those loyal to Carmine Persico and Alphonse Persico, led by Orena's former consigliere Carmine Sessa. (PSR ¶ 38). As this Court explained, "[t]his resulted in conflict between Orena and Persico factions of the Colombo Family in 1991 and 1992, including a number of assassinations and attempted assassinations." Orena Direct Appeal, 32 F.3d at 708. Aware of Sessa's resentment, Orena conspired to assassinate Sessa in June 1991. (PSR ¶ 39). Although Sessa learned about Orena's plan to kill him and plotted to kill Orena instead, Sessa's

5

plan failed.  (Id. ¶¶ 39-40).  A tenuous peace ensued until November 1991.  (Id. ¶ 41).

In November 1991, Orena and his supporters broke the fragile truce by attempting (unsuccessfully) to kill Persico loyalist Gregory Scarpa, Sr.  Following this attempt, the conflict erupted, and members of both factions actively sought to kill members of the opposing faction.  (Id.).  The hostilities resulted in the attempted assassinations, woundings, or successful assassinations of at least 28 people, three of whom were innocent bystanders.  (Id. ¶¶ 43, 54).  One innocent bystander, 18-year-old Matteo Speranza, was murdered while working in a bagel shop owned by two reputed Persico loyalists.  (Id. ¶ 55).  Several other innocent bystanders were injured in the feud, including a murder victim's girlfriend who was struck by a stray bullet, and several pedestrians (including a four-year-old girl) who were hit by a car whose occupants were fleeing from an assassination attempt by gunmen.  See George James, Killing Tied to Mafia War in Brooklyn, N.Y. Times, Dec. 9, 1991, available at https://www.nytimes.com/1991/12/09/nyregion/killing-is-tied-to-mafia-war-in-brooklyn.html (accessed Sept. 30, 2024).

6

Orena was arrested in April 1992 and charged with racketeering, in violation of 18 U.S.C. § 1962(c); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); conspiracy to murder Thomas Ocera, in violation of 18 U.S.C. § 1959(a)(5) and New York Penal Law §§ 125.25 and 105.15; the murder of Thomas Ocera in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(1) and New York Penal Law Sections 125.25 and 20.00; conspiracy to murder members of the Persico faction of the Colombo Family in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(5) and New York Penal Law §§ 125.25 and 105.15; conspiracy to make extortionate extensions of credit, in violation of 18 U.S.C. § 892; conspiracy to make extortionate collections of credit, in violation of 18 U.S.C. § 894; use and carrying of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and unlawful possession of firearms by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (PSR at 1, 3, 5-6; A:4).

Evidence at trial demonstrated Orena's role within the Colombo Family, his aspirations to become the official boss, and his involvement in the internecine war between the Colombo Family factions. Orena Direct Appeal, 32 F.3d at 708.

Evidence also established Orena's role in the murder of Ocera on or about November 13, 1989.  Id.  Prior to his death, Ocera was a member of the Colombo Family.  (PSR ¶ 45).  In connection with his membership in the family, Ocera collected extortion proceeds from various private sanitation companies and was a partner with Orena in a lucrative loansharking business.  (Id. ¶ 46).  In October 1991, Michael Maffatore, a Colombo Family associate who helped bury Ocera's body, led agents from the Federal Bureau of Investigation ("FBI") to Ocera's grave site, where the agents found Ocera's body buried with a metal wire wrapped around his neck.  Orena Direct Appeal, 32 F.3d at 708.  A medical examiner concluded that Ocera's cause of death was strangulation.  (PSR ¶ 52).  Ocera was survived by a disabled wife with multiple sclerosis and three daughters.  (Id. ¶ 53).  At trial, the government offered the testimony of Maffatore and Harry Bonfiglio, who also helped to bury Ocera, regarding Ocera's murder.  Orena Direct Appeal, 32 F.3d at 708.

Evidence at trial also established Orena's role in operating several illegal gambling establishments, as well as loansharking operations.  (PSR ¶ 56).  Members of the Colombo Family loaned money

at illegally high rates of interest, charging between two and five percent weekly interest—equivalent to 104 to 250 percent annually. (Id.). Testimony at trial indicated that Orena had $700,000 "on the street" (i.e., loansharking monies) and had received interest payments totaling $300,000 every year from 1986 to 1990. (Id. ¶¶ 59-60).

In light of the ongoing violence, Colombo Family members actively concealed firearms in their possession. Orena Direct Appeal, 32 F.3d at 708. Between 1991 and 1993, law enforcement authorities recovered over 90 firearms from individuals connected to the Colombo Family conflict. (PSR ¶ 43). When law enforcement agents arrested Orena in April 1992, they recovered nine loaded firearms, ammunition, a bullet-proof vest, and confidential telephone records for members of the Persico faction. (Id. ¶¶ 44, 64).

Several other members of La Cosa Nostra testified about the racketeering and loansharking activities of Orena and the Colombo Family and about Orena's various murder conspiracies, including conspiracies to kill (1) Joseph Ambrosino, a Colombo Family associate; (2) Alfonso D'Arco, a former acting boss of the Lucchese Family; (3) Salvatore Gravano, former underboss of the Gambino Family and a

9

government witness in several organized crime cases; and (4) Diane Montesano, Ocera's girlfriend at the time of his murder.  <u>Orena Direct Appeal</u>, 32 F.3d at 708.

On December 21, 1992, after a month-long trial, a jury found Orena guilty of all counts.  (PSR ¶ 1).

Orena moved for a new trial pursuant to Federal Rule of Criminal Procedure 33, asserting that Gravano committed perjury and alleging prosecutorial misconduct relating to the testimony of Gravano and Montesano.  The district court denied the motion.  <u>Orena Direct Appeal</u>, 32 F.3d at 709.

B.  <u>Sentencing</u>

Following Orena's conviction, The Honorable Jack B. Weinstein, who presided over the trial, sentenced Orena to life imprisonment on Counts One, Two, and Four.  In a sentencing memorandum, Judge Weinstein articulated his rationale for imposing a life sentence:

> Considerations of incapacitation and general deterrence overwhelm all other factors in the sentencing of . . . Orena. . . .  These are not quotidian cases.  These mobsters, working within their own and with other mobs, have thrived in

> and cultivated a complex and pervasive culture of crime that infests and sucks dry entire communities and industries within this city and surrounding areas. Harsh terms of imprisonment are required to incapacitate defendants and extract them from the net of criminal activity in which they have been enmeshed for their adult lives and to which they no doubt would return at the first opportunity. Severe sentences may also by general deterrence save youngsters who might be seduced into the criminal lifestyle of these mobsters.

United States v. Sessa, 821 F. Supp. 870, 874 (E.D.N.Y. 1993). Judge Weinstein added that incapacitation "is the only means of preventing these defendants from perpetuating their criminal activity. Their past histories reveal them to be recidivists who cannot be rehabilitated." Id. Furthermore, he concluded, "Were it not for the fact that the New York police and Federal Bureau of Investigation had bugged their cars and hideouts and frustrated many of their ambushes, the death toll would have multiplied." Id. at 872.

C.    Direct Appeal

Orena filed a direct appeal, raising multiple challenges to his conviction and sentence. See Orena Direct Appeal, 32 F.3d at 709 (listing Orena's 11 claims on appeal).

Among other claims of error, Orena argued that the government had failed (1) to prove the existence of a single RICO enterprise in light of the intra-family war, (2) to allege an overt act as part of murder conspiracy charges, and (3) to name all of the intended victims of the conspiracy to murder the Persico faction members.  Id. Orena also challenged several evidentiary rulings, including the admission of certain co-conspirator statements, firearms seized from Orena's residence, and Ocera's loansharking records.  Id.  Orena also alleged the government condoned perjury by Gravano and failed to disclose evidence regarding the testimony of Gravano and Montesano.  Id.

This Court rejected all Orena's claims of error and affirmed the judgment and the order denying Orena's motion for a new trial.  Id. at 717.

D.    Post-Conviction Proceedings

1.    Section 2255 Petition

Orena and his co-defendant Pasquale Amato later moved for dismissal of their indictments or for new trials pursuant to Federal Rule of Criminal Procedure 33 and filed petitions pursuant to 28 U.S.C. § 2255, on the grounds that the government violated its disclosure

obligations, in addition to other alleged misconduct. <u>Orena v. United States</u>, 956 F. Supp. 1071, 1076 (E.D.N.Y. 1997) (hereinafter "<u>Orena First 2255 Petition</u>"). Their claims were based upon allegations of criminal conduct by Colombo Family member Gregory Scarpa, Sr., who was also an FBI informant, and by former FBI Special Agent R. Lindley DeVecchio, who was Scarpa's FBI "handler." Specifically, Orena and Amato alleged that it was not they, but rather DeVecchio and Scarpa, who had killed Ocera and instigated the internecine war within the Colombo Family. <u>See</u> <u>id.</u> at 1076-77.

Judge Weinstein held several evidentiary hearings which included the testimony of DeVecchio and his former partner, Special Agent Chris Favo. <u>Id.</u> at 1082-83. In a lengthy opinion which exhaustively reviewed all of the evidence, Judge Weinstein categorically rejected the defendants' claims. Specifically, although finding that DeVecchio had shown "lapses in judgment, failures in maintaining proper perspective and unfortunate slips in ability to participate in what is an inherently treacherous and ambiguous relationship," Judge Weinstein also found that the claim that DeVecchio had deliberately attempted to assist Scarpa during the Colombo family war had been

13

shown by "overwhelming evidence to have been demonstrably false and an egregious distortion of the record." Id. at 1103-04.

Judge Weinstein found the government had offered "compelling and voluminous proof of Orena's guilt," id. at 1078, including testimony of cooperating witnesses, recorded conversations, and physical evidence, id. at 1081-82. Judge Weinstein also found that "the DeVecchio–Scarpa relationship was irrelevant to any events or evidence relied upon by the government in the Orena…trial[]." Id. at 1090. The court opined that Orena's argument that undisclosed information regarding the DeVecchio–Scarpa relationship was Brady material "requires crossing the line from rationality to paranoia." Id. at 1097. Finally, Judge Weinstein concluded, "[T]he DeVecchio–Scarpa connection had no discernable effect on the criminal activities of the defendants Orena and Amato or on their trials. Each defendant was driven by the strange calculus of the criminal mobster's mind and environment, not by the F.B.I., and not by Special Agent R. Lindley DeVecchio." Id. at 1112. Judge Weinstein accordingly denied the motions and dismissed the petitions. This Court affirmed his decision by summary order, and the Supreme Court denied Orena's petition for

14

certiorari.  <u>Orena v. United States</u>, No. 97-2277 (2d Cir. Apr. 20, 1998) (summary order), <u>cert. denied</u>, 525 U.S. 874 (1998).

        2.   <u>Rule 60(b) Motion</u>

On January 17, 2003, Orena and Amato moved pursuant to Rule 60(b) of the Federal Rules of Criminal Procedure to vacate the judgment, attempting to present "further 'evidence' in a renewal of their attack on their convictions." <u>Orena v. United States</u>, 299 F. Supp. 2d 82, 83 (E.D.N.Y. 2004).  Judge Weinstein held an evidentiary hearing on their new motions, which featured the testimony of Gregory Scarpa, Jr., the son of Gregory Scarpa, Sr., a convicted murderer and made member of the Colombo Family who was then serving a life sentence.  Scarpa Jr. testified that his father and DeVecchio had killed Ocera and instigated the Colombo Family war.  <u>See</u> <u>id.</u>  Judge Weinstein found that neither Scarpa Jr. nor his "source" (i.e., Scarpa Sr.) was credible and none of the newly presented evidence was persuasive. <u>See</u> <u>id.</u> at 84. Judge Weinstein remarked, "The court's decision of March 10, 1997 denying a similar

collateral attack remains unshaken in its premises and findings." Id. The motions were denied.[3]

### 3. Second Section 2255 Petition

In June 2020, Orena sought leave to file a successive petition pursuant to 28 U.S.C. § 2255, arguing his 18 U.S.C. § 924(c) conviction, predicated on conspiracy to murder under 18 U.S.C. § 1959(a)(5), was no longer valid after Davis, 588 U.S. 445, and arguing that newly discovered evidence undermined the validity of his conviction. This Court granted the motion and transferred the proceeding to the district court on September 24, 2020. See Orena v. United States, No. 20-1984, Docket No. 16 (2d Cir. Sept. 24, 2020).[4] The government agreed that given Davis,

---

[3] A motion by Anthony and Joseph Russo to vacate their convictions was denied by The Honorable Charles P. Sifton, who also found that Scarpa Jr.'s testimony was not credible. See Russo v. United States, No. 03-CV-2059 (CPS), 2004 U.S. Dist. LEXIS 32534, at *65 (E.D.N.Y. Nov. 24, 2004) ("[N]either Scarpa Jr. nor his father are credible and nothing Scarpa Jr. affirms is of any significance without his father's extra-judicial statements.").

[4] Although this Court authorized the filing of the entire application, it addressed only the need to vacate the Section 924(c) conviction and averred that it had not "examined any other arguments or claims raised by Petitioner, including his claim based on newly discovered evidence." Orena, No. 20-1984, Docket No. 16, at 2.

Orena's Section 924(c) conviction must be vacated and the court should undertake a full resentencing of Orena. (DE1852). On reply, Orena indicated that he sought a full de novo sentencing and intended to file a Section 2255 petition addressed to his amended judgment. (DE1853). After a telephone conference in April 2021, Orena requested the district court hold in abeyance his resentencing and Section 2255 petition, which would include the presentation of the additional evidence, pending the outcome of a motion for compassionate release. (DE1857 at 1-2).

E.   Motion for Compassionate Release

In July 2021, Orena filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (DE1864). Orena primarily asserted that he was eligible for release because he suffers from a litany of health conditions.[5] (Id.). Orena also claimed that certain exculpatory evidence was wrongfully withheld and attacked the validity of his underlying conviction. (Id.).

---

[5]   Specifically, Orena claimed to suffer from conditions including dementia/Alzheimer's disease, diabetes, glaucoma, anemia, an abdominal aortic aneurysm, hypertension, heart problems requiring a pacemaker, osteoarthritis, degenerative joint disease, the use of a wheelchair, fall risks, the requirement he be assisted with routine tasks, necessary redirection and reorientation, and certain delusional episodes.

The government opposed, stating that while Orena's plethora of medical conditions arguably met the threshold "extraordinary and compelling reason" requirement, consideration of the 18 U.S.C. § 3553(a) factors indicated that Orena's release was not warranted. (DE1866).

After hearing oral argument on the motion, the district court denied Orena's petition for compassionate release. (GA:10). In a written opinion, the district court recognized that government had conceded that Orena had shown "extraordinary and compelling" circumstances on account of his medical issues. (GA:4). The district court noted, however, that a finding of "extraordinary and compelling" circumstances alone is not sufficient to warrant a sentence reduction, id., and that, even if Orena were eligible, the district court "may deny [his] motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override…what would otherwise be extraordinary and compelling circumstances" (GA:5). The district court held that "Orena's medical issues, though undeniably serious, cannot outweigh the conduct that warranted his original sentence." (GA:8). In reaching that conclusion, the court considered the sentencing factors set forth in 18 U.S.C. § 3553(a), noting that the nature and circumstances of the offense

conduct and the need for the sentence to reflect the seriousness of the offense, provide just punishment, and afford adequate deterrence "carry particular weight here." (GA:5-6).

The district court recognized Orena's leadership role in the Colombo Family, his efforts in triggering a bloody war, his oversight of "a campaign of violence that resulted in a swath of death and serious injury," as well as crippling effects on the city's economy, his involvement in the conspiracy to murder members of the Persico faction, the murder of Thomas Ocera, his activities in prison since his conviction, and the Bureau of Prison's determination he poses a "minimum" risk for violence. (GA:8). The district court noted that while Orena asked the court to consider so-called new evidence that undermined his conviction, such arguments are properly made in a petition for habeas relief. (GA:6 n.4 (citing United States v. Antney, No. 17-CR-229 (CBA), 2021 WL 4502478, at *5 (E.D.N.Y. Sept. 30, 2021)). Judge Komitee concluded, "I am left with the inescapable conclusion that any sentence short of the life term imposed by Judge Weinstein would insufficiently reflect the seriousness of the offense conduct here and fail to provide just punishment." (GA:8).

Orena appealed from the denial of compassionate release and asked that briefing for Orena's Section 2255 petition be suspended until the conclusion of the appeal of his motion for compassionate release. (DE1878).  In June 2022, this Court affirmed the district court's denial of Orena's motion for the sentence reduction in a per curiam order.  See United States v. Amato, 48 F.4th 61 (2d Cir. 2022).  On appeal, Orena primarily contended that the district court erred in denying his motion pursuant to Section 3582 by refusing to consider, what Orena claimed was, new evidence that called into question the validity of his conviction. Id. at 63.  This Court concluded that when considering a motion for sentence reduction pursuant to Section 3582(c)(1)(A), "a district court does not have discretion to consider new evidence proffered for the purpose of attacking the validity of the underlying conviction in its balancing of the 18 U.S.C. § 3553(a) factors.  Facts and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to 28 U.S.C. § 2255 or § 2241." Id.

F.    Request for Resentencing

On April 14, 2023, at the direction of the district court, Orena filed a status report, seeking a de novo resentencing.  (DE1922 at 3).  In

20

support, Orena cited to a government letter from 2020 (DE1852) and to United States v. Powers, 842 F.3d 177, 179 (2d Cir. 2016). The district court ordered a resentencing proceeding to take place on July 6, 2023.

In May 2023, the U.S. Probation Department provided the parties with a revised Presentence Investigation Report. Two weeks later, Orena filed a 15-page letter objecting to the PSR "in its entirety" and purported to list "some brief examples" of those objections. (A:46-60). Orena challenged the PSR's recitation of the evidence at trial, the jury's verdict, the sentencing judge's determinations, and the numerous appellate decisions upholding these factual findings.

By text order, the district court noted Orena had objected to the PSR "in its entirety" and directed Orena to specify what categories of information he wanted Probation to update, whether Orena or his family member sought to be interviewed by Probation, and whether Orena objected to an adjournment to allow Probation to address his objections. (A:39). Orena replied, arguing that the PSR should include updated biographic information, financial information, and the inclusion of all so-called "new evidence" following Orena's conviction. (A:61-64).

The government filed a letter opposing a de novo sentencing and asked the Court to amend the judgment to remove the Section 924(c) conviction and the accompanying sentence (DE1926), citing United States v. Peña, 58 F.4th 613, 618 (2d Cir. 2023); see also Tellier v. United States, No. 21-2959, 2023 WL 3608394, at *1 (2d Cir. May 24, 2023) (summary order).

At a July 6, 2023 status conference, the court and the parties discussed "whether resentencing is indeed necessary or appropriate here." (A:89). Orena argued that it was, and made clear that at a de novo resentencing, he intended to challenge his underlying conviction by means of a Fatico hearing. (A:105). The court asked the parties to submit letters concerning resentencing proceedings. (A:109, 127). The district court scheduled a status conference, which was ultimately held on February 1, 2024.

On January 3, 2024, the government submitted a letter, arguing that a resentencing was not a proper vehicle for Orena (or any defendant) to challenge his underlying convictions and disputing Orena's

requested revisions to the PSR pursuant to the law of the case doctrine.[6] (A:137-49). The government restated its June 2023 position that a de novo sentencing was not required and asked the court to amend the judgment by removing the Section 924(c) conviction and accompanying sentence. (A:143). Orena did not file a response to the government's January 3, 2024 letter.[7]

On February 1, 2024, the district court heard argument on whether the court was required to hold a de novo sentencing for Orena, or whether, if it was not required, the court should exercise its discretion to hold a de novo resentencing anyway. (A:209-10). Orena argued that

---

[6] For instance, Orena challenged the PSR's inclusion of relevant organized crime background information, on which the court relied at Orena's 1993 sentencing (over Orena's objection). (A:144). Orena also challenged the PSR's recitation of trial evidence, including evidence of Orena's involvement in the murder of Ocera, an objection previously rejected in the court's decision regarding Orena's First 2255 Petition and Rule 60(b) Motion. (A:144-45). Orena objected to the PSR's inclusion of the fact that firearms were found and seized from Orena's home. (A:145). This Court found, on direct appeal, that the district court's admission of the firearms into evidence was proper. Orena Direct Appeal, 32 F.3d at 715.

[7] Orena argues that this letter was filed on the "eve of the scheduled status conference." (Br.:11). In fact, this letter was filed a week before the conference was then scheduled to occur, and over four weeks before the conference was actually held on February 1, 2024.

the court should exercise its discretion given the changes involving Orena's "personal pedigree," the now-advisory nature of the United States Sentencing Guidelines (the "Guidelines"), and the so-called new information that Orena claimed called into question his underlying conviction.  (A:211-12, 216-18).  The government argued that the court should decline to hold a de novo resentencing given Orena's remaining eight counts of conviction and three life sentences.  (A:219-20).

The district court issued a memorandum and order denying the defendant's motion for a de novo sentencing and issuing an amended judgment.  (A:246-58).  The district court cited this Court's decision in Peña, 58 F.4th at 615, which held that lower courts may, in their discretion, opt not to conduct a de novo resentencing when a conviction is vacated following a Section 2255 petition, at least as long as the resentencing would be a "strictly ministerial" affair.  (A:248).  The court recognized that Orena differed from the Peña defendant in one respect: putting aside the vacated counts, Orena still faced three (now discretionary) life sentences, while the Peña defendant still faced multiple mandatory life sentences.  Despite that difference, the court noted:

> But I do not read <u>Pena</u> to indicate that such a distinction would eliminate the discretion embedded in Section 2255. Indeed, if the mandatory life sentence were a necessary condition for the exercise of such discretion, that would not really amount to a "discretionary" standard at all.

(A:249). The district court found Orena's grounds for a de novo resentencing were not persuasive. <u>First</u>, while Orena relied on his age, declining health, and lowered risk of recidivism, the district court found those factors did not merit resentencing for the reasons stated in its opinion denying Orena's motion for compassionate release. (<u>Id.</u>). <u>Second</u>, the district court rejected Orena's claim that the now-advisory nature of the Guidelines warranted de novo resentencing, finding that Judge Weinstein clearly determined that a life sentence was appropriate independent of the Guidelines. (A:250). <u>Third</u>, the court found Orena's claims of "new evidence" did not call for a de novo resentencing because the evidence is not new as Orena claimed, and because challenges to the validity of Orena's conviction ought to be brought via a Section 2255 petition. (A:251-52). The district court also noted that the vacated Section 924(c) conviction was "a minor factor, at best, in the total picture

25

of Orena's trial—plainly insufficient to require resentencing of the eight other counts of conviction." (A:252).

On March 28, 2024, Orena filed a notice of appeal. (A:260).

## SUMMARY OF ARGUMENT

The district court properly denied Orena's motion for a de novo sentencing. Orena has shown no error in Judge Komitee's decision not to afford him a de novo resentencing, let alone the required abuse of discretion. Particularly in light of the court's recent determination that the sentencing factors set forth in 18 U.S.C. § 3553(a) warranted the three life sentences previously imposed by Judge Weinstein, Judge Komitee's decision that vacatur of a count carrying a five-year sentence could be remedied by striking those five years from the total judgment was an appropriate exercise of judicial wisdom and common sense.

## ARGUMENT

## IT WAS WITHIN THE DISTRICT COURT'S DISCRETION NOT TO HOLD A DE NOVO RESENTENCING

### I.    Standard of Review

This Court generally reviews questions of law arising from Section 2255 petitions de novo and subsidiary factual findings for clear error.  Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010); see Gonzalez v. United States, 792 F.3d 232, 234 (2d Cir. 2015).[8] "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).  Choice of a remedy under Section 2255—including the decision whether to hold a de novo resentencing—is "subject to abuse of discretion review."  Kaziu v. United States, 108 F.4th 86, 92 (2d Cir. 2024) (citing Peña, 58 F.4th at 623); see also United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998).

---

[8]    When quoting cases, unless otherwise noted, internal citations, quotation marks, and footnotes are omitted, and all alterations are adopted.

28

II.    Applicable Law

Section 2255 of Title 28 of the United States Code provides that where a district court vacates a judgment of conviction, the court "shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."  28 U.S.C. § 2255(b). This Court has observed that this provision gives the district court "broad and flexible remedial authority, having 'vacate[d] and set the judgment aside,' to resentence a defendant and correct the sentence as appropriate." United States v. Gordils, 117 F.3d 99, 103 (2d Cir. 1997) (quoting 28 U.S.C. § 2255(b)); see also, e.g., United States v. Jones, 114 F.3d 896, 897 (9th Cir. 1997) ("[T]he statute gives district judges wide berth in choosing the proper scope of post-2255 proceedings."); United States v. Moore, 83 F.3d 1231, 1234-35 (10th Cir. 1996) ("[T]he vacation of Moore's sentence required the district court to exercise its inherent discretion to determine the appropriate scope of the resentencing proceedings.").

This Court's recent decisions have clarified that resentencing proceedings under 28 U.S.C. § 2255 do not automatically require full resentencing proceedings triggering the rights of Federal Rule of

29

Criminal Procedure 43. See Peña, 58 F.4th at 623; Kaziu, 108 F.4th at 91; Tellier, 2023 WL 3608394, at *2; United States v. Ayyad, No. 20-3832, 2023 WL 1975682, at *1 (2d Cir. Feb. 14, 2023) (summary order). The specific circumstances under which a district court abuses its discretion in determining not to pursue de novo sentencing have not been delineated. Cf. Kaziu, 108 F.4th at 91 ("Peña expressly declined to define the circumstances under which a district court abuses its discretion when it fails to resentence a defendant de novo following a successful collateral attack on a conviction….[I]t did not decide that question, and neither do we.").

The Court has, however, identified certain factors that make resentencing proceedings more or less necessary. In Peña, the defendant challenged his mandatory life sentences following his convictions for murder-for-hire and murder-for-hire conspiracy, arguing that because the jury was erroneously instructed, his convictions carried, at most, ten-year maximum sentences. This Court affirmed the district court's refusal to conduct a de novo resentencing, holding that the defendant's convictions were procedurally defaulted and meritless. Thus, the Court held that "[a]ny resentencing would have been 'strictly ministerial,'

30

serving simply to delete the sentences on the now-vacated counts." Peña, 58 F.4th at 623.

In Kaziu, the Court identified two factors that made such a proceeding necessary in that case: first, substitution of a new judge in place of the sentencing judge, who would lack "direct knowledge of how the 'constellation of offenses of conviction' impacted the defendant's sentence.'" 108 F.4th at 93 (quoting United States v. Quintieri, 306 F.3d 1217, 1227 (2d Cir. 2002)). Second, in Kaziu, the defendant "plausibly claimed," supported by a "lengthy memorandum," meaningfully changed circumstances. Id.

Conversely, in Ayyad, a new district court judge did not abuse its discretion by failing to hold a resentencing proceeding after vacating one count carrying a mandatory consecutive 30-year sentence, because it was plain from the facts of the case that any sentence imposed would result in a sentence well above the defendant's life expectancy. Specifically, Judge Kaplan wrote:

> On any resentencing he would have to be sentenced to 360 months imprisonment on Count 9, to be served consecutive to any sentence imposed on the other counts. He is 53 years old. In order for a de novo resentencing to have any

real world effect – that is, to give him any real chance of release prior to his passing – the Court would have to impose concurrent sentences of 27 years or less on Counts 1-6 and 8. The probability of such a sentence on Counts 1-6 and 8 for a man who used his position as an engineer at Allied Signal, a large New Jersey chemical company, to order the necessary chemical ingredients for bomb making, and to order hydrogen tanks from ALG Welding Company that would enhance the bomb's destructive force in circumstances in which six died, more than a thousand were injured, and millions of dollars of damage done [in connection with the 1993 World Trade Center bombing] is sufficiently slim as to make a de novo resentencing an unwise exercise of this Court's discretion. That is all the more so when one considers that the object of this movant's crime was even more horrific, as evidenced by the killing of over 3,000 people in the successful 2001 attack on the World Trade Center.

Ayyad v. United States, No. 16-CV-4346 (LAK), 2020 WL 5018163, at *3 (S.D.N.Y. Aug. 24, 2020). This Court affirmed that logic. Ayyad, 2023 WL 1975682, at *1 ("The district court reasoned that—given the nature of Ayyad's crimes, the significant amount of time remaining on his sentence, and Ayyad's current age—resentencing would not realistically lead to a sentence short enough for Ayyad to be released within his lifetime. Such a decision is not an abuse of discretion.").

Accordingly, the unlikelihood of meaningful relief, understood in the context of the severity of the underlying crime, can be a factor that permits a district judge to forgo full resentencing.

## III.  Discussion

### A.  Judge Komitee Correctly Exercised His Discretion in Concluding a De Novo Resentencing Was Not Necessary

Judge Komitee acted well within his discretion when he declined to resentence Orena de novo.  Judge Komitee determined that the vacated count—a Section 924(c) charge for firearm possession, carrying a five-year mandatory consecutive sentence—was a "minor factor, at best, in the total picture of Orena's trial."  (A:252).  Accordingly, a resentencing proceeding would have been an "empty formality."  Ayyad, 2023 WL 1975682, at *1.

Indeed, at trial, the government proved that Orena, a former acting boss of the Colombo crime family, ignited an internecine war within the Colombo crime family that resulted in the attempted assassinations, woundings, or successful assassinations of at least 28 individuals—three of whom were innocent bystanders.  Orena was convicted (and sentenced) as follows: racketeering (life), racketeering conspiracy (life), conspiracy to commit murder-in-aid-of-racketeering (10

years), murder in-aid-of-racketeering of Thomas Ocera (life), conspiracy to murder members of the Persico faction of the Colombo crime family in-aid-of-racketeering (10 years), conspiracy to make extortionate extensions of credit (20 years), conspiracy to make extortionate collections of credit (20 years), and unlawful possession of firearms by a convicted felon (10 years). Orena's Guidelines range was life. (A:245; PSR ¶ 254-55).

Judge Weinstein, the sentencing judge, wrote a lengthy and detailed memorandum on May 24, 1993, explaining why three life sentences in addition to other terms of imprisonment were required by the relevant sentencing factors. Judge Weinstein noted that Orena "had an important role in the Colombo organized mob and in the war for its leadership," and "participated in the full range of crimes attributed to the mobs," including "murders, conspiracies to murder, loansharking and other serious continuing crimes." Sessa, 821 F. Supp. at 872-73. He found that "[s]tatutorily mandated considerations of general deterrence and incapacitation, 18 U.S.C. §§ 3551 and 3553, require a life sentence and high fines for" Orena. Id. at 871. Judge Weinstein added that "[i]ncapacitation is the only means of preventing these defendants from

perpetuating their criminal activity. Their past histories reveal them to be recidivists who cannot be rehabilitated." Id. at 874. Furthermore, he concluded, "Were it not for the fact that the New York police and Federal Bureau of Investigation had bugged their cars and hideouts and frustrated many of their ambushes, the death toll would have multiplied." Id. at 872. Accordingly, Judge Komitee found that vacating one count of possessing a firearm during this campaign of unrelenting violence was "plainly insufficient to require resentencing of the eight other counts of conviction." (A:252).

The district court's decision was well grounded in the discretion afforded by the Section 2255 statute, which has been repeatedly recognized by this Court. See Peña, 58 F.4th at 623; Kaziu, 108 F.4th at 91; Tellier, 2023 WL 3608394, at *2; Ayyad, 2023 WL 1975682, at *1; see also United States v. Savoca, 596 F.3d 154, 161 (2d Cir. 2010) ("Upon granting [defendant's] petition and vacating the sentence, the District Court had discretion in determining whether any useful purpose would be served in reconsidering the sentence . . . The District Court was under no obligation to conduct a complete resentencing . . . .").

It also comports with this Court's decision in <u>Ayyad</u>. There, the defendant faced a mandatory 30-year sentence and seven other discretionary sentences. Judge Kaplan, who did not oversee Ayyad's trial, determined that given the Ayyad's age and the nature of his crimes, any resentencing would be an "empty formality." <u>Ayyad</u>, 2023 WL 1975682, at *1. This Court affirmed that exercise of discretion by a new district judge. <u>Id.</u>

Orena argues that Judge Komitee abused his discretion because Orena's sentences were not mandated by statute. (Br.:18). Mandatory sentences, however, are not a prerequisite for the judicial discretion enshrined in Section 2255, and this Court has not required mandatory sentences to deny a de novo resentencing. While this Court has recognized that convictions carrying mandatory minimum sentences of life imprisonment can render resentencing "strictly ministerial," such a sentencing scheme is only provided as one example of when resentencing would be an "empty formality." <u>See</u> <u>Tellier</u>, 2023 WL 3608394, at *2 ("But if resentencing would be "strictly ministerial" or an "empty formality," <u>such as</u> when one or more of the sentences carry mandatory minimum sentences of life imprisonment, then a district court

36

does not abuse its discretion by declining to conduct de novo resentencing on counts that are not vacated.") (emphasis added). As Judge Komitee noted in his order denying Orena's resentencing, "if the mandatory life sentence were a necessary condition for the exercise of such discretion, that would not really amount to a 'discretionary' standard at all." (A:249).

Orena also contends that the district court abused its discretion in denying a resentencing because the Guidelines are no longer mandatory. (Br.:18). This ignores Judge Weinstein's determination that "a life sentence was appropriate on a Section 3553(a) analysis, rather than purely as a matter of the Guidelines' application." (A:250). As Judge Weinstein wrote in his comprehensive sentencing opinion:

> The Guidelines are of little assistance in these cases. They focus myopically on mechanical aspects of the offenses. Their formulaic scheme fails to account for the overall picture of these defendants developed during three trials and in three thorough and exhaustive presentence reports. These criminals must be punished in the proper context of their lives and their overall actions, not in the vacuum of "units," "offense levels" and "adjustments" created by the Guidelines.

Sessa, 821 F. Supp. at 875. Judge Komitee again considered these statements in weighing whether a de novo resentencing was appropriate here.

Moreover, Judge Komitee had weighed all of the relevant sentencing factors in connection with Orena's 2021 compassionate release application, in which the sole contested question was the balance of the relevant sentencing factors. (GA:1-9; A:249). This familiarity with the record and the appropriate considerations for sentencing allowed Judge Komitee greater insight into the specific weight of the five-year Section 924(c) sentence amid the total mix of Orena's multiple life sentences. Cf. Kaziu, 108 F.4th at 92-93.

Contrary to Orena's claims on appeal (Br.:19), Judge Komitee also considered mitigating factors, including his health and his allegations of rehabilitation, in fashioning his compassionate release decision. (GA:1-9). Having just weighed these considerations, Judge Komitee had the discretion to decide whether, in light of the removal of the Section 924(c) count, he now required a de novo resentencing to determine whether and how to reevaluate those factors. When deciding whether to conduct a de novo resentencing, Judge Komitee noted

explicitly that "Orena relies—first and foremost—on his age and health challenges, including advanced dementia. Given these developments, Orena argues (credibly) that the risk of recidivism is markedly lower than it was at his original sentencing." (A:249). Judge Komitee explained that he "already considered Orena's health issues and recidivism risk in denying his motion for compassionate release," (Id. (citing GA:1-10—a decision which the Second Circuit affirmed in 2022. Amato, 48 F.4th at 63)).

B.  This Court's Decision in *Kaziu* Does Not Require a De Novo Sentencing

On appeal, Orena primarily argues that this Court's decision in Kaziu—which was published several months after Judge Komitee's decision denying a de novo resentencing—requires remand for a de novo resentencing. However, Judge Komitee was as well-placed as the original sentencing judge to determine how the vacated count and its five-year sentence affected the eight remaining counts of conviction and three life sentences, if at all.

1.  New Sentencing Judge

Orena argues that the simple substitution of the district judge satisfies the first Kaziu factor, which counsel toward de novo

resentencing if the sentencing judge lacked "direct knowledge of how the 'constellation of offenses of conviction' impacted the defendant's sentence.'" 108 F.4th at 93. Here, Judge Komitee did not lack such knowledge. He was privy to the sentencing judge's detailed explanation for Orena's life sentences as well as from his own evaluation (and denial) of Orena's motion for compassionate release—which rose and fell on the relevant sentencing factors, as both sides agreed that there were "extraordinary and compelling reasons" that would allow the district court to shorten Orena's sentence had it been appropriate. (GA:1-10).

In Kaziu, the Court explained that the original sentencing judge "retains privileged access to the rationale behind the original sentence, a deep familiarity of the facts, and an in-person observation of the defendant's allocution." Kaziu, 108 F.4th at 92. The Court explained that the judge assigned to resentence Kaziu after his successful petition did "not know the contours of [prior judge's] decision-making and to what degree (if any) the now vacated convictions may have inflated Kaziu's sentences on his remaining convictions." Id. "Ultimately," the Court opined, "a new judge cannot be certain that simply lopping off the sentence of a vacated count sufficiently remedies a sentencing package

40

that did, in some undetermined, opaque capacity, factor in a now vacated conviction." Id. However, as Judge Lynch explained in his concurrence in Kaziu, there are certain circumstances in which a substitute judge is as well-placed as the sentencing judge to determine whether a de novo sentencing is appropriate:

> There are many circumstances in which any judge familiar with sentencing practice would quickly recognize that a complex set of sentences on interrelated counts was integrated in a way that no longer makes sense once a particular count is undermined—or, alternatively, that the sentences on two distinct counts do not present that problem.

Kaziu, 108 F.4th at 103. Accordingly, Judge Lynch explained, although the identity of the sentencing judge is a relevant factor, it hardly "justifies a rule that a successor judge is barred from concluding that a simple deletion of the invalidated sentence would be the appropriate remedy." Id.

Here, Judge Komitee had "access to the rationale behind the original sentence," that the district judge lacked in Kaziu. Id. In sentencing Orena, Judge Weinstein wrote and published a comprehensive memorandum discussing the rationale behind the sentences he imposed. In this nine-page decision, Judge Weinstein

explains that Orena "must be imprisoned for life." <u>Sessa</u>, 821 F. Supp. at 875.  He also wrote:

> The evidence in this case and other cases tried in this court proves beyond any doubt that these defendants will not abandon their criminal activities and mob membership upon release from incarceration. They will try to participate in gang activities from prison. No matter how aged or infirm, they will continue to represent serious dangers to the community.

<u>Id.</u> at 873.  Judge Weinstein did not reference the now-vacated count as a factor bearing on the total sentence, and instead focused on the overall seriousness of Orena's crimes and the need to incapacitate him and deter other would-be mobsters.   Judge Komitee cited this decision in his opinion denying de novo resentencing.  He also recognized that, "Judge Weinstein of course knew and expected that a life sentence would extend through Orena's old age and infirmity, and that the factors of just punishment, the violent and deadly nature of the offense conduct, and the need to afford adequate deterrence nevertheless dictated that a life sentence was the only appropriate option."  (A:249-50).

Furthermore, Judge Komitee was required to understand the interplay between the relevant convictions and sentencing factors in this

42

case, because he was charged with determining what the appropriate sentence was in light of the existence of extraordinary and compelling reasons that would permit him to vacate Orena's sentence. Unlike the new district judge in <u>Kaziu</u>, Judge Komitee had already done the work of understanding and weighing the relevant sentence factors in Orena's case.

### 2. Changed Circumstances

Orena also argues that the second <u>Kaziu</u> factor—that Orena "plausibly claimed" meaningfully changed circumstances in several ways—further indicates the necessity of his de novo resentencing. However, the district court evaluated these so-called changed circumstances and found they did not warrant de novo resentencing.

<u>First</u>, as to Orena's age- and health-related circumstances (Br.:24-25), Judge Komitee previously considered Orena's condition, as well as his institutional record and did not find those factors recommended a lesser sentence. (A:252). Moreover, the aging process and the passage of time affects every defendant sentenced to a term of incarceration. Such changed circumstances cannot require resentencing

on their own, or else every defendant would be entitled to a de novo resentencing.

Second, Orena argues there is "abundant evidence" that undermines his convictions. (Br.:28). The district court also rejected this basis for a de novo resentencing. (A:252 (citing Amato, 48 F.4th at 63 ("Facts and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to 28 U.S.C § 2255 or § 2241."))). This claim is not properly before the Court on this appeal—for Orena to be sentenced as though the jury's oft-examined and not-overturned verdicts were somehow deficient, he would need to (successfully) challenge his outstanding convictions. Nevertheless, the government provides the following responses to Orena's factual assertions.[9]

---

[9] Orena's arguments in this section, which do not bear on the issues before this Court, are substantially identical to the arguments that he raised in the appeal from the denial of his motion for compassionate release. Compare Br.:30-38 with United States v. Orena, No. 21-2747 (2d Cir.), Docket No. 33, at 15-23. Accordingly, the government's responses are also largely drawn from the government's responsive brief in that case.

44

Contrary to Orena's hyperbolic assertion that the "the so-called Colombo War cases has [sic] been exposed as the single most corrupt in the history of our criminal justice system" (Br.:30), this Court has consistently rejected the claims of defendants challenging their convictions based upon the Scarpa/DeVecchio evidence.  See United States v. Sessa, 711 F.3d 316 (2d Cir. 2013); United States v. Monteleone, 257 F.3d 210 (2d Cir. 2001); United States v. Persico, 164 F.3d 796 (2d Cir. 1999); United States v. Orena, 145 F.3d 551 (2d Cir. 1998); United States v. Malpeso, 115 F.3d 155 (2d Cir. 1997).  Ironically, while Orena refers to "[c]ourt opinions" that have allegedly exposed "the corruption and ethical violations that marked the prosecution in this case and all related cases" (Br.:30-31), his appellate brief fails to mention, let alone address, any of the opinions of this Court cited above that have rejected such claims, save in one footnote.  (Br.:29-30 n.13 (mischaracterizing Orena, 145 F.3d at 560, which described the "Scarpa" evidence as supporting "only an exceedingly weak inference" in defendants' favor)).

In this case, Judge Weinstein held hearings and wrote a comprehensive opinion denying the defendants' motions, and this Court summarily affirmed his decision.  Orena v. United States, No. 97-2277

45

(2d Cir. Apr. 20, 1998). As noted above, Judge Weinstein did not merely reject the defendants' arguments as unpersuasive; he remarked that accepting their contention that DeVecchio colluded with Scarpa to foment the Colombo war would "require[] crossing the line from rationality to paranoia." Orena First 2255 Petition, 956 F. Supp. at 1097. Judge Weinstein also found that Orena and his codefendant Amato had been convicted "by overwhelming evidence in fair trials" and that "the Scarpa-DeVecchio connection had no discernable effect on the criminal activities of the defendants Orena and Amato or on their trials." Id. at 1112.

Orena nevertheless asserts that alleged new facts that "have been discovered in recent years…undermine the integrity of Mr. Orena's conviction and, indeed, the government's whole theory of prosecution." (Br.:37). But Orena is not entitled to relitigate Judge Weinstein's findings under the guise of seeking a de novo resentencing proceeding on unchallenged convictions. As this Court already determined when affirming the district court's denial of Orena's motion for compassionate release, a challenge to the validity of Orena's underlying convictions must be brought via a Section 2255 or 2241 petition relating to the challenged counts, or on direct appeal. See Amato, 48 F.4th at 63 ("Facts

46

and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to 28 U.S.C § 2255 or § 2241.").

While that is sufficient to dispose of Orena's argument, it also bears mention that Orena's rendition of the "record facts" that allegedly support his argument sometimes omits crucial details. For example, Orena cites DeVecchio's 2006 indictment in Kings County Supreme Court for homicide and includes a lengthy quotation from the state court in that case that was critical of the FBI. (Br.:31-34). But Orena fails to mention that the case was dismissed in the middle of trial when the District Attorney's office discovered that its chief witness, Linda Schiro, had previously made a recorded statement that contradicted her trial testimony about DeVecchio's involvement in the charged murders. In the same opinion that Orena extensively quotes, the state court acknowledged that "[t]here was no evidence presented at this trial, save the now discredited testimony of Linda Schiro, that the defendant committed any of the acts charged in the indictment." People v. Devecchio, 2007 N.Y. Misc. LEXIS 7827, at *5 (Sup. Ct. Kings Cnty. Nov. 1, 2007). Orena does not explain how the discredited testimony of one

47

witness could have undermined Judge Weinstein's well-supported findings. Moreover, in <u>Sessa</u>, this Court rejected another defendant's <u>Brady</u> claim based on the Scarpa/DeVecchio relationship after considering, inter alia, DeVecchio's aborted homicide prosecution. <u>See</u> <u>Sessa</u>, 711 F.3d at 320, 322.[10]

Another "new" fact cited by Orena is Judge Sifton's order granting a new trial to three defendants in <u>United States v. Persico, Jr.</u>, 92-CR-0351 (CPS) (Br.:32 & n.15). However, this Court overturned Judge Sifton's decision, finding that there was no <u>Brady</u> violation. <u>See</u> <u>Orena</u>, 145 F.3d at 560-61.

Orena also points out that defendants in other cases relating to the Colombo conflict were acquitted after some or all of the Scarpa/DeVecchio evidence was admitted. (Br.:32); <u>see</u> <u>United States v.</u>

---

[10] In another case Orena does not address, the wife of one of Scarpa's murder victims (represented by Orena's current counsel) brought a civil suit against DeVecchio and Special Agent Chris Favo for allegedly assisting in the murder. <u>Grancio v. DeVecchio</u>, 572 F. Supp. 2d 299 (E.D.N.Y. 2008), <u>reconsideration denied</u>, 608 F. Supp. 2d 362 (E.D.N.Y. 2009). Judge Block granted summary judgment for the defendants, ruling that the plaintiff "failed to adduce sufficient admissible evidence to support her claim that DeVecchio and Favo played a part in her husband's murder." <u>Id.</u> at 314.

Orena, No. 93-CR-1366 (ERK) and United States v. Cutolo, No. 93-CR-1230 (EHN). However, in Malpeso, this Court subsequently affirmed the defendants' convictions in a case where Judge Dearie excluded the Scarpa/DeVecchio evidence after carefully reviewing the arguments that had been made by the defendants in the Orena and Cutolo cases and concluding that the evidence had minimal, if any, probative value that was outweighed by the risk of unfair prejudice to the government. See 115 F.3d at 163. The Persico Court also addressed this issue and concluded that "[t]he acquittals of some defendants in other cases demonstrates the relative weakness of the evidence against those defendants, rather than any mitigating force of the Scarpa-DeVecchio information." 164 F.3d at 805. No such weakness existed in the case against Orena.

In short, the government strongly disputes that any new facts have undermined Judge Weinstein's original findings, and its position is supported by decisions of this Court that Orena ignores.

Finally, there is another significant difference in the changed circumstances alleged by Orena and in Kaziu. In Kaziu, this Court found that the original rationale underlying the sentence—that he was a

49

committed and unredeemed terrorist—may no longer apply. Conversely, as further demonstrated by his arguments above, Orena has shown no remorse or acceptance of responsibility for his crimes of conviction. He has spent the last thirty years attacking the jury's verdict and the competent evidence against him and the PSR and falsely blaming others for the crimes he carried out and directed, which resulted in substantial harm, including the loss of many lives.

50

C.   Remand to a Different District Court Judge Is Not
     Warranted

"Remanding a case to a different judge is a serious request rarely made and rarely granted." United States v. Vargas, 961 F.3d 566, 584 (2d Cir. 2020).  Indeed, this Court will grant reassignment only in "unusual circumstances." United States v. Brennan, 395 F.3d 59, 75-76 (2d Cir. 2005).  "As a general rule, even when a sentencing judge has been shown to have held erroneous views or made incorrect findings…resentencing before a different judge is required only in the rare instance in which the judge's fairness or the appearance of the judge's fairness is seriously in doubt." United States v. Bradley, 812 F.2d 774, 782 n.9 (2d Cir. 1987).  Where there is no allegation that the judge harbors a personal bias against the defendant, the Court considers the following factors in assessing whether reassignment is warranted:

> whether the original judge would reasonably be
> expected upon remand to have substantial
> difficulty in putting out of his or her mind
> previously-expressed views or findings determined
> to be erroneous or based on evidence that must be
> rejected, (2) whether reassignment is advisable to
> preserve the appearance of justice, and (3)
> whether reassignment would entail waste and
> duplication out of proportion to any gain in
> preserving the appearance of fairness.

51

United States v. Robin, 553 F.2d 8, 10 (2d Cir. 1977); see Brennan, 395 F.3d at 75-76.

Here, Orena contends, citing no evidence, that a different district judge is required because Judge Komitee "intends in all regards to rely on Judge Weinstein's 1993 sentencing related findings, notwithstanding the abundant demonstrable evidence of materially changed circumstances, as described above, that undermine those findings." (Br.:38).

Judge Komitee refused to consider this so-called new material in evaluating Orena's motion for compassionate release. This Court affirmed that decision, holding that "[f]acts and arguments that purport to undermine the validity of a federal conviction must be brought on direct appeal or pursuant to 28 U.S.C § 2255 or § 2241." Amato, 48 F.4th at 63; see also Antney, 2021 WL 4502478, at *5 (noting that the proper procedure for challenging the validity of a conviction is on direct appeal or through a habeas petition). Here, in his motion for de novo resentencing, Orena has once again brought in material and argument outside the realm of direct appeal or Section 2255. Judge Komitee

52

correctly relied on this Court's precedent in refusing to consider Orena's arguments.

There is no basis for remanding this case at all. But if there were, this is not a case in which there is any basis for remanding it to a different district court judge. There is nothing in the record that even suggests this is the required "rare instance in which the judge's fairness or the appearance of the judge's fairness is seriously in doubt." <u>Bradley</u>, 812 F.2d at 782 n.9.

53

<u>CONCLUSION</u>

For the reasons stated, the district court's order should be affirmed in all respects.

Dated:     Brooklyn, New York
         October 7, 2024

Respectfully submitted,

BREON PEACE,
<u>United States Attorney</u>,
<u>Eastern District of New York</u>.

By:    <u>       /s/       </u>
        DEVON LASH
        Assistant U.S. Attorney

NICHOLAS J. MOSCOW,
DEVON LASH,
<u>Assistant United States Attorneys</u>,
    (<u>Of Counsel</u>).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 9,399 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
       October 7, 2024

                           /s/
                  NICHOLAS J. MOSCOW
                  Assistant U.S. Attorney

APPENDIX

## TABLE OF CONTENTS

Page

Memorandum & Order,
  United States v. Victor Orena, No. 92-CR-351 (EK),
  Dated October 27, 2021...................................................................GA01

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

 UNITED STATES OF AMERICA,

                                        <u>MEMORANDUM & ORDER</u>
             -against-                     92-CR-00351(EK)

 VICTOR J. ORENA,

                    Defendant.

-------------------------------------x

ERIC KOMITEE, United States District Judge:

## I.   Background

        Victor Orena was a senior member of the Colombo

organized crime family and, for a time, its acting boss.  In

1993, a jury found him guilty of a litany of serious crimes

including murder, murder conspiracy, and racketeering.[1]  The

Honorable Jack B. Weinstein sentenced Orena to life

imprisonment.  Currently incarcerated at Federal Medical Center

("FMC") Devens, Orena now moves for compassionate release.

---

[1] Orena was convicted of racketeering in violation of 18 U.S.C.
§ 1962(c); racketeering conspiracy in violation of 18 U.S.C. § 1962(d);
conspiracy to murder Thomas Ocera, in violation of 18 U.S.C. § 1959(a)(5);
the murder of Thomas Ocera in-aid-of racketeering, in violation of 18 U.S.C.
§ 1959(a)(1); conspiracy to murder members of the "Persico faction" of the
Colombo organized crime family in-aid-of racketeering, in violation of 18
U.S.C. § 1959(a)(5); conspiracy to make extortionate extensions of credit, in
violation of 18 U.S.C. § 892; conspiracy to make extortionate collections of
credit, in violation of 18 U.S.C. § 894; use and carrying of a firearm in
relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and
unlawful possession of firearms by a convicted felon, in violation of
18 U.S.C. §§ 922(g)(1) and 924(a)(2).  *See* ECF No. 198; Pre-Sentence Report
("PSR") ¶¶ 1-13.

GA02

In addition to the instant motion, Orena also has a pending habeas corpus petition. He invokes two grounds for habeas relief: first, that his conviction under Section 924(c)(1) is invalid, and second, that newly discovered evidence will demonstrate that he is actually innocent of one or more offenses for which he was convicted. The government has conceded the first ground — that Orena's Section 924(c)(1) conviction must be vacated in light of *United States v. Davis*, 139 S.Ct. 2319 (2019). Orena has requested, through counsel, that this Court decide his motion for compassionate release prior to briefing or a decision on the remaining Section 2255 ground.

For the reasons stated below, I deny Orena's motion for compassionate release.

## II.  Legal Standard

A motion for compassionate release is governed by 18 U.S.C. § 3582(c)(1)(A). This section "permits a defendant to bring a motion for a reduction in sentence, including release from prison, in federal district court after satisfying a statutory exhaustion requirement." *United States v. Fernandez*, 853 F. App'x 730, 731–32 (2d Cir. 2021) (summary order).[2] Under the First Step Act, a district court may

---

[2] Orena filed a *pro se* administrative request in 2019; this request was granted by the Warden at FMC Devens but then overridden by the Assistant

> reduce the term of imprisonment . . . after
> considering the factors set forth in section 3553(a)
> to the extent that they are applicable, if it finds
> that . . . extraordinary and compelling reasons
> warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A)(i).  "[D]istrict courts have broad

discretion in deciding whether to grant or deny a motion for a

sentence reduction."  *United States v. Antney*, No. 17-CR-229,

2021 WL 4502478, at *1 (E.D.N.Y. Sept. 30, 2021) (citing *United

States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020)).

### III. Discussion

### A. "Extraordinary and Compelling Circumstances"

The government does not dispute that Orena, who is 87

years old, suffers from an array of medical issues.  As

acknowledged by the Bureau of Prisons, these include dementia

and Alzheimer's disease, diabetes, glaucoma, anemia, an

abdominal aortic aneurysm, hypertension, heart problems

requiring a pacemaker, osteoarthritis, and degenerative joint

disease.  *See* Memorandum from Assistant Director Ken Hyle ("Hyle

Memo") at 2-3, ECF No. 1862-2.  Orena uses a wheelchair, is at

risk of falling, and requires assistance with routine tasks.

*Id.*  Due to his mental decline, Orena is said to receive "a

---

Director of the Bureau of Prisons ("BOP").  *See* Memorandum from Assistant
Director Ken Hyle ("Hyle Memo"), ECF No. 1862-2.  Because the government does
not dispute that Orena exhausted his administrative remedies as required by
18 U.S.C. § 3582(c)(1), *see* Mem. in Opp'n. to Mot. for Release ("Opp'n.
Memo"), ECF No. 1865 at 8 n.3, I need not further discuss the exhaustion
requirement.

significant amount of redirection and reorientation," *id.*, and his medical records from the past year reflect certain "delusional episodes."  BOP Health Services Clinical Encounter Records ("BOP Records") at 7, ECF No. 1862-4; *see also id.* at 6, 9, 11.  Orena's medical conditions place him at increased risk of contracting COVID-19 or, if he contracts it, suffering severe consequences.[3]

The government concedes that these conditions "arguably meet the threshold 'extraordinary and compelling reason' requirement for the Court to consider the defendant's request."  Mem. in Opp'n. to Mot. for Release ("Opp'n. Memo") at 9, ECF No. 1865.  However, a finding of "extraordinary and compelling" circumstances alone is not sufficient to warrant a sentence reduction; the "court must also consider 'the factors set forth in section 3553(a) to the extent that they are applicable' before granting a sentence reduction."  *Fernandez*, 853 F. App'x at 732. (quoting § 3582(c)(1)(A)); *see also United States v. Gotti*, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) ("[A] defendant who meets all the criteria for compassionate release consideration . . . is not thereby automatically entitled to a

---

[3] *See Groups at Higher Risk for Severe Illness*, Centers For Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited October 16, 2021).  The Court notes that, according to Orena's medical records, the medical staff at FMC Devens offered Orena the vaccine against COVID-19 but he declined it.  BOP Records at 8.

sentence modification.  He is simply eligible for a sentence modification.").  Thus, even if Orena is eligible, this Court "may deny [his] motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override . . . what would otherwise be extraordinary and compelling circumstances." *Gotti*, 433 F. Supp. 3d at 615.

**B. Section 3553(a) Factors**

The Section 3553(a) factors that the Court must consider in granting or denying compassionate release include:

> the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant; and the need to avoid unwarranted sentencing disparities.

*United States v. Seshan*, 850 F. App'x 800, 801 (2d Cir. 2021) (quoting *United States v. Roney*, 833 F. App'x 850, 852 (2d Cir. 2020)); 18 U.S.C. § 3553(a).

Following the adoption of the First Step Act, a strain of cases – some of which I discuss below – has emerged in which the offenders' criminal history is so long, and their victims so numerous, that even serious health conditions do not suffice to merit relief.  This case falls squarely in that category. Certain of the Section 3553(a) factors carry particular weight here: the nature and circumstances of the offense conduct; and the need for the sentence to reflect the seriousness of the

offense, provide just punishment, and afford adequate
deterrence.

Orena was a singular figure in the annals of the
Colombo family, as detailed in the Indictment, the Pre-Sentence
Report, and Judge Weinstein's comprehensive Sentencing
Memorandum.[4] He rose to a leadership role, becoming acting boss
in 1988, and his efforts to cling to power triggered a bloody
war. PSR ¶¶ 43-49. Orena oversaw a campaign of violence that
resulted in a swath of death and serious injury. He conspired
to assassinate at least thirteen members of the Colombo family's
"Persico faction," including Carmine Sessa and Gregory Scarpa,
Jr. PSR ¶¶ 45, 47, 60. In the end, the war with the Persico
faction led to the deaths or serious injuries of at least
fifteen people. *Id.* ¶¶ 49, 61. Orena ordered the murder of
Thomas Ocera, among others; Ocera's strangled body was found
nearly two years later. *Id.* ¶¶ 56-59.[5] At least three of the

---

[4] I note that Orena has suggested that new evidence — a "vast array" of
it — either casts doubt on his guilt on one or more counts of conviction or
constitutes such powerful impeachment material that a jury would have
rejected the testimony of key government witnesses. *See* Def.'s Reply in
Support of Release at 2, ECF No. 1869. Those arguments are properly made in
a petition for habeas relief, not this motion. For purposes of this motion,
I assume the legitimacy of Orena's convictions and the accuracy of the PSR.
*See, e.g., Antney*, 2021 WL 4502478, at *5 ("A motion for compassionate
release should not be used to attack the legitimacy of a judge's imposed
sentence — such an attack is properly brought on direct appeal or in a habeas
petition, not in a motion for compassionate release brought under 18 U.S.C.
§ 3582(c)(1)(A).").

[5] In addition, the PSR notes that a preponderance of the evidence
supports the conclusion that Orena also ordered the murder of Jack Leale —

people injured or killed as a result of this campaign were bystanders.  *Id.* ¶ 49, 60.

It may border on the mundane to invoke the economic consequences of Orena's activity, given this bloodshed.  But the activities of the Colombo and other families during this period had crippling effects on substantial parts of New York City's economy.  Judge Weinstein noted that the "drain on the city's human and economic resources caused by this criminal activity has been a major factor in the deterioration of our social, political and economic infrastructure." *United States v. Sessa*, 821 F. Supp. 870, 874 (E.D.N.Y. 1993), *aff'd sub nom. United States v. Amato*, 15 F.3d 230 (2d Cir. 1994), *and aff'd sub nom. United States v. Orena*, 32 F.3d 704 (2d Cir. 1994), *and aff'd*, 41 F.3d 1501 (2d Cir. 1994).[6]  In the end, Judge Weinstein

_____

the man who killed Ocera — as punishment for failing to properly bury Ocera, and to prevent Leale from testifying.  *Id.* ¶¶ 266-273.

[6] Judge Weinstein explained the Colombo family's economic activities at the time as follows:

The Colombo division of organized crime is one of five now operating in New York City. It is a lucrative enterprise. Its stock-in-trade is loansharking. Members of the various crews loan funds at extortionate rates of interest, usually in the neighborhood of 100 to 250 percent per year, and enforce the terms of those loans with threats of violence. A portion of the proceeds of these loans . . . is shared with the higher-ups within the organization. The mob's illegal gambling operations work in tandem with this financing scheme.

Like the other New York City criminal mobs, the Colombos have profited from the control of labor unions. This activity depends upon the cooperation of corrupt union officials. Typically the organized crime families will assist contractors who wish to avoid utilizing union labor by guaranteeing "labor

estimated, "[t]he direct and indirect costs" of mafia activity "to the honest people of the metropolitan area are measured in the billions of dollars." *Id.* at 874.

Orena's medical issues, though undeniably serious, cannot outweigh the conduct that warranted his original sentence. I have considered Orena's arguments, including his activities in prison and the BOP's determination that he poses a "minimum" risk for violence. *See* BOP Risk Assessment, dated April 4, 2021, ECF No. 1862-3. But I am left with the inescapable conclusion that any sentence short of the life term imposed by Judge Weinstein would insufficiently reflect the seriousness of the offense conduct here and fail to provide just punishment.[7]

This conclusion finds support in other recent decisions on compassionate release. *See, e.g.*, *United States v. Gioeli*, No. 08-CR-240, 2020 WL 2572191, at *5 (E.D.N.Y. May 21, 2020) (denying release in light of "defendant's participation in multiple conspiracies to commit murder"; early release would be inconsistent with the need for adequate punishment and

---

      peace" in exchange for a fee which is then shared with the corrupt union leaders.

*Id.* at 871-72.

   [7] Judge Weinstein surely understood that a life sentence would likely result in Orena's incarceration even as an elderly and infirm inmate, and he would not have imposed the sentence lightly, given that understanding.

deterrence); *Gotti*, 433 F. Supp. 3d at 619 (even if organized-crime defendant were eligible for compassionate release, "reducing his sentence would undermine the goals of sentencing; among them, the need to provide just punishment").

Orena invokes a number of other cases in which organized crime defendants have served shorter sentences than his despite amassing what he says are similarly violent, or even more serious, criminal histories.  Orena cites the cases of Gregory Scarpa, Jr.,[8] Joseph Massino,[9] and Carmine Sessa,[10] among others.  But these cases generally involved high-ranking defendants who elected to cooperate with the government, at serious risk to themselves and at a time when such cooperation was necessary to break the stranglehold that the five families exerted over so much of the City's industry.[11]  Those cases do not support a different outcome here.

---

[8] *United States v. Scarpa*, No. 94-CR-1119-1, 2020 WL 6591455 (E.D.N.Y. Nov. 11, 2020).

[9] *United States v. Massino*, No. 03-CR-929 (E.D.N.Y.) (Am. J. Resentencing Def., dated Sept. 6, 2013, ECF No. 1182).

[10] *United States v. Orena*, No. 92-CR-351-3 (E.D.N.Y.) (J. Sentencing Def. Carmine Sessa, dated Sept. 29, 2000, ECF No. 1582).

[11] Orena relies on other cases that are likewise distinguishable.  For example, in *United States v. Wong Chi Fai*, the court granted compassionate release to a defendant who had only months to live due to terminal cancer; notably, the "[g]overnment . . . [did] not argue that . . . he would be a danger to the community or that his release would otherwise go against the 18 U.S.C. § 3553(a) sentencing factors."  No. 93-CR-1340, 2019 WL 3428504, at *2 (E.D.N.Y. July 30, 2019).  In *United States v. Underwood*, the defendant's rehabilitation in prison was so "pronounced" and "exemplary" as to be publicly recognized – including by a United States senator and federal judge

### IV.  Conclusion

For the foregoing reasons, I deny the motion for compassionate release.  The motion is denied without prejudice to renew in the event of significant developments in Orena's habeas proceeding or significant further deterioration of his health.


SO ORDERED.


_/s/ Eric Komitee_
ERIC KOMITEE
United States District Judge


Dated:     October 27, 2021
           Brooklyn, New York

---

– and the court noted that he would "likely merit a sentence reduction" _regardless_ of his medical issues.  No. 88-CR-822, 2021 WL 3204834, at *2, 5 (S.D.N.Y. Jan. 15, 2021).

10